# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CASE NO.:  21-13245

FLORIDA DEPARTMENT OF JUVENILE JUSTICE,

Appellant,

v.

LAWANNA TYNES

Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF FLORIDA

## BRIEF OF APPELLANT

Respectfully submitted,
Carri S. Leininger, Esq.
Florida Bar No.:  0861022
Jayme Sellards, Esq.
Florida Bar No.: 60066
Williams, Leininger & Cosby, PA
11300 US Highway One, Suite 300
N. Palm Beach, FL 33408
**Counsel for Appellant**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, Appellant, Florida Department of Juvenile Justice, respectfully submits the following Certificate of Interested Persons and Corporate Disclosure Statement:

## CERTIFICATE OF INTERESTED PERSONS

Dimitrouleas, William, United States District Court Judge

Florida Department of Juvenile Justice (Stock Ticker: none)

Leininger, Carri S., Esq.

Miller, Glenn, Esq.

Sellards, Jayme, Esq.

Snow, Lurana, United States District Court Magistrate Judge

Tynes, Lawanna

Williams, James, O., Jr., Esq.

Wiseberg, Philip, Esq.

Williams, Leininger & Cosby, P.A.

## CORPORATE DISCLOSURE AND CERTIFICATION

Florida Department of Juvenile Justice is a state agency of Florida. As a result, no publicly traded company or corporation has an interest in the outcome of the case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument and submits it may be of assistance to the Court. The jury trial lasted six days and included numerous witnesses and exhibits spanning sixteen years of employment. Appellant believes it may be helpful to the court to have counsel available to address questions the court may have about the record and issues on appeal.

## <u>TABLE OF CONTENTS</u>

**Page**

STATEMENT REGARDING ORAL ARGUMENT……………..…………….iii

TABLE OF CONTENTS……………………………………………………..iv

TABLE OF CITATIONS ..................................................................................v

PRELIMINARY STATEMENT ......................................................................3

STATEMENT OF JURISDICTION……………………………..………….1
.
STATEMENT OF THE ISSUES………………………………………  2

STATEMENT OF THE CASE AND FACTS ................................................4

    Statement of the Facts…………………………………………………..4

    Statement of the Case……………………………………………………15

SUMMARY OF THE ARGUMENT ...................................................18

ARGUMENT ...................................................................................................20

    I. Appellee Failed To Prove Her Title VII Claims For Race
    And Sex Discrimination……………………………………………………20

    II. Appellant Did Not Prove An Essential Element of a
    42 U.S.C. §1981 Claim…………………………………………………..37

CONCLUSION...................................................................................44

CERTIFICATE OF SERVICE ..........................................................45

CERTIFICATE OF COMPLIANCE WITH FONT STANDARD........................45

## **TABLE OF CITATIONS**

<u>Cases</u>                                                                                                          <u>Page</u>

*Abel v. Dubberly*,

    210 F. 3d 1334, 1337 (11th Cir. 2000)……………………………....……20

*Alvarez v. Royal Atl. Devs., Inc.*,

    610 F. 3d 1253, 1266 (11th Cir. 2010)……………………………..……..21

*Blash v. City of Hawkinsville*,

    856 Fed. Appx. 259 (April 21, 2021)…………………………………31, 32

*Chapman v. AI Transp.*,

    229 F. 3d 1012, 1030 (11th Cir. 2000)……………………………....……21

*\*Comcast Corp. v. National Ass'n of African American-Owned Media*,

    140 S. Ct. 1009 (2020)…………………………………………..……38, 40

*Gross v. FBL Fin. Servs, Inc.*,

    129 S. Ct. 2343, 2349 (2009)……………………………….…………….38

*\*Lewis v. City of Union City, Georgia*,

    918 F. 3d 1213, 1222 (11th Cir. 2019)……………………..22, 23, 24, 25, 26

*Luke v. University Health Services, Inc.*,

    842 Fed. Appx. 503 (11th Cir. 2021)…………..……………………33, 34

*Mendoza v. Borden, Inc.*,

    195 F. 3d 1238, 1244 (11th Cir. 1999)……………………….……..20

*Mitchell v. Toledo Hosp.*,

    964 F. 2d 577, 580, 583 (6th Cir. 1992)……………….…………….25

*Rollins v. TechSouth, Inc.*,

    833 F. 2d 1525, 1528 (11th Cir. 1987)…………………………….21

*Silvera v. Orange County School Board*,

    244 F. 3d 1253, 1259 (11th Cir. 2001)…………………………..……..26

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502, 506 (1993)……………………………….…………………..22

*United States v. Adams*,
    74 F. 3d 1093 (11th Cir 1996)……………………...…………………….40

*United States v. Iglesias*,
    915 F. 2d 1524, 1529 (11th Cir. 1990)………………………………...41

*Ward v. Troup County School District,*
    856 Fed. App'x. 225 (11th Cir. 2021)……………......……21, 22, 24 35, 36

## Statutes

42 U.S.C. §1981…………………………………………………………...37, 39

42. U.S.C § 2000e-2(m)…………………………………………………...…..38

## STATEMENT OF JURISDICTION

The basis for the District Court's subject-matter jurisdiction is federal question jurisdiction pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345, as Appellee, LAWANNA TYNES ("Tynes"), filed a civil action against the Appellant, FLORIDA DEPARTMENT OF JUVENILE JUSTICE ("FDJJ"), alleging race and sex discrimination under Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981.  [DE 1, p. 2].

The Final Judgment was entered on July 27, 2021, and an Amended Final Judgment was entered on September 8, 2021.  [DE 121, DE 147].  The District Court denied FDJJ's Renewed Motion for Judgment as a Matter of Law or Alternatively, Motion for New Trial on August 27, 2021.  [DE 143].  FDJJ filed its Notice of Appeal on September 21, 2021.  [DE 152].

The appeal is timely.  *See* Fed. R. App. P. 4(a)(4)(A).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291 as an appeal of a final decision of a district court of the United States.  This appeal is from a final judgment that disposes of all parties' claims.

1

## <u>STATEMENT OF THE ISSUES</u>

1)      Whether the District Court erred in denying FDJJ's Rule 50 Motion by holding that Tynes' two comparators were sufficient to establish her race and sex discrimination claims under Title VII of the 1964 Civil Rights Act.

2)      Whether the District Court erred in denying FDJJ's Rule 50 Motion by holding that Tynes properly plead and proved a claim for race discrimination under 42 U.S.C. §1981.

## PRELIMINARY STATEMENT

This appeal arises out of an employment discrimination case filed by the Appellee, Lawanna Tynes. The Appellant is the Florida Department of Juvenile Justice (FDJJ). At the time of her termination, she was employed as a superintendent at the Broward Juvenile Detention Facility. FDJJ fired the Plaintiff after an unheard of fifteen (15) codes were called in a single day at the Broward Juvenile Detention Center. The Plaintiff claims the termination was discrimination.

FDJJ will be referred to as FDJJ or the Defendant.

The Appellee will be referred to as "Plaintiff" or Ms. Tynes.

References to the Record will be by Docket Entry number in the District Court followed by the page number, except the Trial Transcript.

The Trial Transcript is not numbered consecutively. The numbering starts at 1 at the beginning of each day. The trial lasted six (6) days. The references to the transcript will be by day and page number, i.e. [TT 3-121]

References to the Appendix will be by the DE number or PDF number [App.  ]

## STATEMENT OF THE CASE AND FACTS

**STATEMENT OF FACTS**

"The custody and care of juveniles entrusted to the Department is paramount." [DE 122-24, p.4].  The proper management of staff and facilities is essential to FDJJ meeting its objectives.  [DE 122-24, p.4]

**Plaintiff's work history**

The Plaintiff, Lawanna Tynes, was first employed by FDJJ in 1999.  She is a black female.  FDJJ promoted her numerous times and in 2007 FDJJ promoted her to the position of Superintendent.  [TT 2: 68-71] .  Upon the recommendation of her immediate supervisor and the Regional Director, Dr. Gladys Negron ("Director Negron"), the Assistant Secretary of Detention Services Dixie Fosler ("AS Fosler") transferred the Plaintiff to the Broward Regional Juvenile Detention Center ("Broward Facility") in August of 2015. [TT 2:75]  The Broward Facility is  a tier five facility (tiers denote the size of the facility with five being the largest).  [DE 36 at 1]  In 2015, there were 100 people on staff at the Broward Facility.  [TT. 3-111]

**15 codes called on November 15th**

The Broward Facility is divided into three separate areas called "mods". [TT. 75]  A mod consists of a large open dayroom surrounded by cells that can be locked. There are also bathroom and shower facilities in each mod. [TT 3:75]

4

On November 15, 2015, fifteen (15) codes were called throughout the day and throughout different sections of the facility.   A code is called when an officer needs assistance. [TT. 3-72]   During cross-examination, the Plaintiff testified to the following timeline prepared by her Supervisor [TT. 3-80, 73-82]:

8:39 am – a code blue is called because of a physical altercation between youths.

9:02 – EMS arrives to transport one of the youths.

9:14 – The Ft. Lauderdale Police Department are called because of the altercation

10:00 – Guards concerned that the mod (a section of the facility) is still unstable.

10:15 – a code Green is called because staff was concerned about an escape.

11:38 – a "code white cutdown" indicating a possible suicide attempt.

11:42 – Another code blue is called because youth are being disruptive.

12:21pm – A code blue is called

12:28 – a code blue is called

1:58 – A code blue is called due to an altercation involving multiple youths. Ft. Lauderdale Police are called again.

3:00 - Captain Burks arrives.

5:15 – another code blue is called

5:40 - a code blue is called in the dining hall due to a physical altercation between Youth.

8:14 – a code blue is called due to a fight in the girls mod. [TT 81]

8:17 – A code blue is called for youth involved with staff.

9:20 – code blue is called

9:40 – code blue is called

11:24pm – code blue is called

The Plaintiff admitted that from 8:30 in the morning until 11:30 at night the entire day consisted of a series of disruptive behaviors, fights, two separate calls to the police, and a call to fire rescue. [TT. 3-82] The Plaintiff admitted that this was "very off day" and "it was not a good day", but frequently claimed ignorance repeatedly saying "I was not there". [TT. 3-77].

November 15 was a Sunday [TT 3:5]. The Plaintiff was at home when she was notified about the ongoing codes. She did not come to the facility. The Plaintiff testified that Captain Burks usually handled weekend duty so Captain Burks went into the facility. [TT. 3:49] The Plaintiff testified at trial that she spoke to Captain Burks on November 15 while the facility was experiencing 15 codes but could not recall what they discussed. [TT. 3-50] The Plaintiff was not even aware that Captain

6

Burks did not report to the facility on November 15 until 3:00 in the afternoon.  [TT. 3-50]

The Plaintiff testified she did not come to the facility because she had high blood pressure and her doctor had signed paperwork on Friday, November 13 to be placed on FMLA. [TT 3:5, 46] The FMLA paperwork was emailed to FDJJ on November 17 after the November 15 incident. [DE 123-11, Defendant's Ex. 175]

FDJJ mandates that certain incidents require the facility call the Central Communications Center (CCC).  The Plaintiff admitted during cross examination that there were several different incidents that occurred on November 15 that individually mandated a call to the CCC, but no one called the CCC on November 15.  [TT. 3-86-87]

The Plaintiff did not  call the Central Communications Center ("CCC") on November 15.  She did not call her Regional Director on November 15.   She did not ensure that her staff called the CCC or the Regional Director about the on-going codes on November 15.  [TT 3:86-89;5:74]

When the Plaintiff arrived at the Broward Facility on Monday, November 16, she did not take any steps to make sure the CCC had been called the day before.  [TT. 3:89]   Indeed, an email to the Plaintiff from Tallahassee at 3:39pm on November 16 and the Plaintiff's response sent at 5:43pm show that the Plaintiff had

7

not taken any steps to make sure the CCC had been notified.  Additionally, her responses on November 16 failed to disclose that the police had been called twice to the facility on the 15th (she reported only one incident of policy involvement). [TT. 3:93-94, DE 123-8, Ex.107]. The CCC was not called until after 5pm the following day. [DE 123-8]

The Plaintiff's Direct Supervisor and the Regional Director testified that she had never heard of a facility having fifteen (15) codes called in a single day.  The Regional Director further testified that had she been notified she would have gone to the facility because fifteen (15) indicates that the staff had lost control of the facility.  [TT. 5:74]

The events of November 15 raised concerns about the facility.  FDJJ ordered someone from the Regional staff to be at the facility each day from November 15 through Thanksgiving.  [TT 3-95]  FDJJ also assembled a Tactical Assessment Team ("Team") of DJJ officers to investigate and ensure that proper procedures were being followed to ensure the safety and security of the Youth and staff [Technical Assistance Report, DE 122-10; TT. 2:120] The Team arrived at the facility on November 30 and stayed until December 4.  [DE 122-26, Plaintiff's exhibit 79; TT 3: 28]  The Team generated its report detailing the numerous deficiencies.[DE 122-10]

8

Upon first arriving at the Facility on November 30, the Team was made aware of an on-going incident involving five youth that had barricaded themselves in a room for more than twelve (12) hours and would not come out. [Id. at 2; TT 2:82; 3-119] This was due in part to the staff's failure to follow proper procedure. [Id.] The Team helped de-escalate the confrontation and coaxed the Youths safely out of the room. [DE 122-10, p.2; TT 3-120]

During their investigation, the Team learned the Youth's rooms were routinely not locked after bedtime, they were allowed to stay up and watch television after midnight, there was no set schedule during the day, and the youth were not receiving the required schooling. [DE 122-10, p.4] The Youths were not locked down during shift change (lockdown allows Youths to rest and be secure in their rooms while the staff is changing). Additionally, Staff were instructed not to use the confinement cells which contributed to the staff losing control. Instead the cells were used for storage. [DE 122-10, p.4] Furthermore, there was a spike in incidents where staff had to put their hands on the Youths.[Id. at p.1]

The Team's investigation also revealed on-going failure to manage staffing. The Plaintiff violated procedure by not having a Master Schedule. [DE 122-24, p.2] She had no system for providing coverage when a supervisor called out. The use of overtime doubled during her tenure. [Id. at p.7] Staff satisfaction plummeted under

9

the Plaintiff's watch from 4.0 before she arrived to 2.4 when she left in December. [DE 122-10, p.2]

The Plaintiff failed to have a system in place to track staff who were on alternate duty because of worker's compensation which contributed to the staffing issues. [ID. at p. 6] In December of 2015, the facility had ten (10) staff who were on alternate duty and the Plaintiff was not aware of their status because she did not properly track their status. [Id. at p.6] Once the Team arrived, they learned that two (2) of the staff had been cleared by their doctor to return to full duty back in October (two months earlier) but the Plaintiff failed to return them to full duty. (The Team immediately returned these two (2) staff members to regular duty). [Id.]

There were other indications that the Plaintiff repeatedly failed to follow FDJJ procedures. The Plaintiff did not document facility inspections. [TT. 3:117-118] Also, there was no Master Key list. When the Team arrived at the facility in November it learned that five sets were missing. The Team was able to locate two sets of keys in the maintenance office, but three sets were never found. [Id. at p.8]

The Team stayed at the facility from November 30 through December 4, 2015 and generated a report. [DE 122-10] FDJJ terminated the Plaintiff on December 11, 2015, for violation of numerous standards and codes. [DE 122-23]. A/S Fosler

testified at length regarding the events of November 15 and the Plaintiff's violations of FDJJ codes and standards. [TT. 5:72-111]

**The Plaintiff's Evidence at Trial**

The Plaintiff presented no direct evidence of racial or sex discrimination. The Plaintiff offered no evidence of discriminatory comments or writings. [TT. 3:29] The Plaintiff offered no statistical evidence. Furthermore, the Plaintiff and her witnesses acknowledged that DJJ had promoted her numerous times starting from an entry level position as a transport officer in Key West to Superintendent at one of the largest facilities in the state.

The people who promoted her were a Hispanic female and a white female. The Plaintiff's Regional Supervisor testified that she had three black female superintendents (there were seven facilities in her region). [TT. 5:55] . The Plaintiff testified she felt discriminated against because of "her race ***and*** gender". [TT: 3-29, 30]

The vast majority of the Plaintiff's case did not focus on comparators but rather focused on her overall performance throughout her career. The Plaintiff's main witness, Ms. Negron, began by reading an affidavit she had signed which discussed the Plaintiff's long work history with DJJ, her certifications and awards, and her lack of prior disciplinary history. [TT 5:40-44] It was clear that Ms. Negron

11

thought very highly of the Plaintiff having nominated her for Superintendent of the Year and inviting the Plaintiff to her home for a birthday party. [TT. 5:80] The Plaintiff also testified at length about her training certifications and awards. [TT. 2:90-106]

The Plaintiff presented evidence of Quality Improvement Reports (QI Reports). These reports are based on routine, scheduled facility inspections conducted by Quality Improvement staff.  They are done annually or semi-annually. [TT 2:70-71; 6:10-20] The Plaintiff testified at length that she never failed a QI and that she believed her comparators did.  The Plaintiff also testified that she passed numerous other types of reviews, like the PREA audit.  [TT 2:79-80]

The Plaintiff's comparator evidence was based solely on two (2) comparators: a white male and a white female. The Plaintiff did not offer any evidence that either comparator was a Superintendent at a facility that experienced fifteen (15) codes or numerous codes in a single twenty-four period.  Rather, the Plaintiff's comparator evidence was limited to offering evidence of isolated incidents with the comparators.

**Comparator Joseph Seeber**

The Plaintiff designated Joseph Seeber, a white male, as one of the comparators. [TT. 5:29]   He worked for DJJ from 2011 through 2018. [TT. 5:21]

12

### Incident at Broward County Facility in 2015

Seeber served as the superintendent of the Broward facility from mid-2013 to mid-2015. [TT.5:21]  On March 6, 2015, a female youth from the Broward facility escaped while she was at a hospital.  [DE 122-8]  Seeber was the superintendent at the time.  The female youth was pregnant and therefore was handcuffed with her hands in front and was not shackled.  [TT. 5:29] There were two officers with her at the time. She was captured less than 24 hours later.

By coincidence, the Plaintiff was the DJJ employee tasked with writing the report.  [DE 122-8, IG Report; TT. 5:23] The IG report does not reference any deficiencies by Superintendent Seeber.  Furthermore, the report indicates timely notification by Seeber and the staff.   Lastly, there are no findings that Seeber's management caused or contributed to this incident.  Rather, the two officers admitted they knew the proper "touch protocol" but failed to follow it when escorting the juvenile.  [Id. at p.4; TT. 5:29]

### Incident at Manatee County Facility in 2018

Seeber served as the Superintendent at the Manatee County Facility when a juvenile committed suicide on June 10, 2018.  [IG Report, DE 122-6]  The incident occurred during the evening hours while Superintendent Seeber was home.  The facility contacted him and he immediately reported to the facility and contacted the

13

CCC.  [Id. at pp. 1,11] The IG investigation did not find any concerns attributed to Seeber.  There was  no evidence of other codes or incidents that occurred during or near the same day as the suicide.

After a poor QI report in 2018, FDJJ decided to terminate Mr. Seeber, a white male and he chose to resign. [TT. 5:31]

**Comparator Daryl Wolfe**

The Plaintiff also designated Daryl Wolfe as a comparator.  Daryl Wolfe worked in Juvenile Detention for more than thirty-eight (38) years. [TT. 5:99] The last fifteen (15) years of her career was spent working as a Superintendent in several DJJ facilities throughout the state.  [TT. 5: 87, 99]

***Comment at Dade Facility in 2013***

In 2013, Ms. Wolfe was the Superintendent of the Dade facility.  In April of that year a juvenile made a "rather inappropriate" comment. [TT 5:90] After resolving that incident, Ms. Wolfe went into to a quality review meeting and explained what the youth had said.  Someone at the meeting took offense and reported Ms. Wolfe for repeating the offensive comment.  She received a verbal reprimand.  [TT.5: 90]

14

*Spray Painting Incident at the Dade Facility*

There are occasions when FDJJ staff encourage Youths to paint murals on the walls of the Dade detention facility. [TT. 5:98]  By coincidence, the offices for the Regional Staff were on the same grounds as the Dade detention facility.   While Superintendent at the Dade  facility, Ms. Wolfe had some of the Youth paint a mural. [TT. 5:98] Ms. Negron was the Regional Director at the time and testified about the incident. Ms. Negron testified that she was angry about this incident because some Regional Staff apparently complained they had asthma attacks when they went home and the Youths' mural included gang signs. [TT. 5:46-47]

There was no testimony and no evidence of any codes being called or any other incidents on the same day. Also, there was no testimony of any complaints by the Youths or the staff at the detention facility. Ms. Wolfe had the mural painted over once her assistant pointed out the gang signs.  [TT. 5:98]

**STATEMENT OF THE CASE**

On November 28, 2018, the Plaintiff filed her action against FDJJ bringing two counts for employment discrimination: Count I alleged racial discrimination under Title VII and Count II alleged sex discrimination under Title VII.  [DE 1] . The Complaint does not present any counts under Section 1981.  Neither Counts I

15

or II allege violation of Section 1981. Section 1981 is only mentioned in the paragraph regarding federal jurisdiction and the prayer for relief. [DE 1, pp. 2,14]

On May 29, 2020, the trial Court granted, in part, the FDJJ's Motion for summary judgment as to four comparators but denied the motion as to two comparators. [DE 61] The case proceeded to a jury trial.

The parties jointly filed a Pretrial Stipulation. [DE 62] The Plaintiff's concise statement of facts references Title VII but does not reference Section 1981. The Issues of Fact section references Title VII but not 1981. The Issues of Law section again references Title VII but does not mention Section 1981. The only mention of Section 1981 is in the section regarding the basis for federal jurisdiction.

Over FDJJ's repeated objections, the Plaintiff was allowed to present a case of racial discrimination under Section 1981. FDJJ objected during opening to Plaintiff's reference to Section 1981 because it was not pled in the complaint or listed in the Pretrial Stipulation. [DE2:30] At the close of the Plaintiff's case FDJJ moved for Judgment as a matter of law under Rule 50 on both the Title VII and Section 1981 claim. [TT. 5:14] The judge denied the motion. During the charge conference FDJJ renewed its objection to the jury being charged on Section 1981. [TT. 6:51] FDJJ renewed the Rule 50 motion at the end of case. [TT. 5:114; 6:44] The jury returned a verdict finding that the Plaintiff's race or sex was a motivating factor

16

prompting her termination. [DE 119]. The jury also found that the Plaintiff's race was a but-for cause of the termination. [DE 119]. The jury awarded the Plaintiff back pay of $424,600 and $500,000 in pain and suffering damages. [DE 119] Post-trial, FDJJ filed a Renewed Motion for Judgement as a Matter of Law or Alternatively, Motion for New Trial. [DE 141]. The court denied the motion. [DE 143]

The trial court entered Final Judgment on July 27, 2021. [DE 121] The trial court entered its order denying post trial motion on August 24, 2021. [DE 141] Amended Final Judgment was entered on September 8, 2021. [DE 147] FDJJ filed its Notice of Appeal. [DE 152]

## SUMMARY OF THE ARGUMENT

The District Court erred in failing to grant FDJJ's Rule 50 Motion for Judgment as a Matter of Law for two reasons. First, Tynes failed to show that her two proposed comparators were valid, which is required to prove a circumstantial case of race or sex discrimination under Title VII. In order for Tynes' comparators to be valid, they must have been "similarly situated in all material respects" to Tynes. One material respect in which Tynes and her comparators must have been similarly situated relates to their conduct. As such, any valid comparator must have engaged in the "same basic conduct" that led to Tynes' termination.

The conduct that led to Tynes' termination was a lack of oversight that resulted in 15 different emergency "codes" being called at her facility over a 24-hour period, including 13 codes for fighting, one code for an attempted escape, and one code for an attempted suicide. The "same basic conduct" standard is strictly construed, and the undisputed evidence reflects that Tynes' proposed comparators did not even remotely engage in the same basic conduct as Tynes, and no reasonable jury could find otherwise. Thus, she failed to prove her Title VII claims due to a lack of valid comparators.

Second, Tynes failed to prove at trial that her race was the "but-for" cause of her termination, which is required to find liability under § 1981. While Title VII and

18

§ 1981 claims have some similarities, they are entirely separate and distinct causes of action with different standards of proof.  In order to sustain a claim under § 1981, Tynes was required to initially plead and ultimately prove that "but for" her race, she would not have been terminated.

As an initial matter, Tynes failed to plead a cause of action under § 1981 in her Complaint and did not reference a § 1981 claim in the Joint Pretrial Stipulation. Indeed, the first mention that Tynes made of her intention to pursue a §1981 claim came in her opening statement at trial.  However, she merely mentioned §1981, and did not discuss the "but-for" standard required to prove a § 1981 claim. Additionally, Tynes did not offer any testimony or other evidence to prove that race was the "but for" cause of her termination, nor did Tynes state in her closing argument that the "but-for" element had been proven at trial.  Consequently, no reasonable jury could find that Tynes proved a claim for race discrimination under § 1981.

19

## **ARGUMENT**

## I. **APPELLEE FAILED TO PROVE HER TITLE VII CLAIMS FOR RACE AND SEX DISCRIMINATION**

### A. **Standard of Review**

A Rule 50 motion for judgment as a matter of law is reviewed *de novo*, and the appellate court applies the same standards employed by the district court. *Abel v. Dubberly*, 210 F. 3d 1334, 1337 (11th Cir. 2000). As such, the appellate court is to consider "whether such sufficient conflicts exist in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that that party is entitled to succeed in his or her position as a matter of law." *Id.* Additionally, a motion for judgment as a matter of law will be denied only if "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Id. See also Mendoza v. Borden, Inc.*, 195 F. 3d 1238, 1244 (11th Cir. 1999).

### B. **An Employer Can Fire an Employee for Almost Any Reason, But Cannot Discriminate**

Title VII makes it unlawful for an employer to discriminate on the basis of an employee's race or sex. *See* 42 § U.S.C. 2000e-2. However, "federal courts do not

20

sit as a super-personnel department that reexamines an entity's business decisions." *Chapman v. AI Transp.*, 229 F. 3d 1012, 1030 (11th Cir. 2000). The "sole concern" in a Title VII civil action is whether the employer engaged in unlawful discrimination – not whether the plaintiff is, in fact a good employee. *Ward v. Troup County School District*, 856 Fed. Appx. 225, 227 (citing *Alvarez v. Royal Atl. Devs., Inc.*, 610 F. 3d 1253, 1266 (11th Cir. 2010)). In other words, "an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.*

In order to prove race or sex discrimination, a plaintiff may present direct evidence of discrimination. *Rollins v. TechSouth, Inc.*, 833 F. 2d 1525, 1528 (11th Cir. 1987). Direct evidence is "evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption." *Id.* at 1532 n.6. Where no direct evidence of race or sex discrimination exists, plaintiffs may attempt to prove their case by presenting some form of circumstantial evidence. *Id.* at 1528. In the instant case, the Appellee was unable to present any direct evidence, so she attempted to use circumstantial evidence to prove her Title VII discrimination claims.

## C.    Discrimination Is Treating "Like" Persons "Differently," Not Treating "Different" Persons "Differently"

The Eleventh Circuit has stated "many times" that "discrimination consists of treating like cases differently." *Lewis v. City of Union City, Georgia*, 918 F. 3d 1213, 1222 (11th Cir. 2019). The converse is also true: Treating *different* cases differently is not discriminatory. *Id.* at 1222-23. By its very nature, therefore, discrimination is a comparative concept – it requires an assessment of whether "like" people or things are being treated "differently." *Id.* at 1223.

This comparative concept is memorialized in the elements necessary to prove a case for wrongful termination under Title VII based upon circumstantial evidence, which is the basis of the Appellee's claims. Specifically, "a plaintiff must show by a preponderance of the evidence that she: (1) is a member of a protected class; (2) was qualified for the position from which she was terminated; (3) was terminated; and (4) *was treated less favorably than similarly situated employees outside her protected class*." *Lewis*, 918 F. 3d at 1221 (citing, *e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). The last element, which is the focus of this appeal, is the heart of a wrongful discrimination claim.

Indeed, qualified employees of any protected class can be terminated from their positions for scores of reasons – or for no reason at all. *Ward*, 856 Fed. Appx.

22

at 227. However, they cannot be terminated based solely upon their sex or race. *Id.* As such, if an employee in a protected class believes she was fired for discriminatory reasons, she must demonstrate that an employer treated "similarly situated" employees (i.e., "like" employees) outside of her class "differently" than herself. *Lewis*, 918 F. 3d at 1223. In other words, a plaintiff must supply the "missing link" between her firing and her minority status to prove unlawful discrimination. *Id.*

### 1. Comparators Are Used to Prove "Different" Treatment of "Like" Persons

The way a plaintiff demonstrates that her employer has engaged in unlawful discrimination – i.e., the employer has treated "like" employees "differently" – is through an assessment of comparators. *Lewis*, 918 F. 3d at 1218. These comparators must be sufficiently "like" the plaintiff, save for plaintiff's minority status, so that the comparators' "different" treatment from the plaintiff clearly proves unlawful discrimination. *Id.* Thus, it is crucial for there to be a standard that comparators must meet to show they are "similarly situated" to the plaintiff, so that a valid comparison can be made.

### S2.    Comparators Are "Like" a Plaintiff if They Are "Similarly Situated in All Material Respects"

The importance of finding comparators who are "similarly situated" cannot be overstated.  Again, federal courts are not to act as a "super-personnel department that reexamines an entity's business decisions" to hire, fire, or promote employees. *Ward*, 856 Fed. App'x. 227.  The sole concern in a Title VII civil action is whether the employer engaged in unlawful discrimination.  *Id.*  Therefore, if there is too low a bar on finding comparators who are "similarly situated" to the plaintiff, employers will not be allowed to treat different situations differently, and courts will be "thrust …into staffing decisions that bear no meaningful indicia of unlawful discrimination." *Lewis*, 918 F. 3d at 1226.

Accordingly, this Court adopted a standard that would strike an appropriate balance between employee protection and employer discretion in examining a claim of unlawful discrimination.  *Id.* at 1225.   A plaintiff must show that she and her comparators are "*similarly situated in all material respects*."  *Id.* at 1226 (emphasis added).

The question, then, is what exactly does "similarly situated in all material respects" mean?  As stated in *Lewis*, "doppelgangers are like unicorns – they don't exist."  918 F. 3d at 1225.  Consequently, in practice, there will be no absolutely

24

perfect comparator – someone who is *exactly* the same as the plaintiff in *all* respects. However, this Court strongly cautioned that it must not stray too far from exactness – from the "Platonic form" of perfect likeness – when analyzing a comparator. *Lewis*, 918 F. 3d at 1225.

If a comparator is not a close enough copy of the plaintiff, courts will allow different things to be treated differently, which is not unlawful discrimination. Thus, the "sameness" of a comparator and a plaintiff is intended to be a high bar. "[A]pples should be compared to apples," this Court said, not oranges. *Lewis*, 918 F. 3d at 1226.

**D.    Comparators Are Only "Similarly Situated in All Material Respects" if They "Engaged in the Same Basic Conduct as Plaintiff"**

The *Lewis* Court opined that the sort of similarity required to meet the "in all material respects" standard must be analyzed on a case-by-case basis. *Lewis*, 918 F. 3d at 1227. However, it provided crucial – and relevant – guidelines to be followed on what the plaintiff and comparator must have in common. Significantly, this Court said that a similarly situated comparator:

> **Will have engaged in the same basic conduct (or misconduct) as the plaintiff**, *see, e.g.*, *Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 580, 583 (6th Cir. 1992) (holding that a plaintiff terminated for "misuse of [an employer's]

> property" could not rely on comparators allegedly guilty
> of "absenteeism" and "insubordination")…;

*Lewis*, 918 F. 3d at 1227 (emphasis added).

Therefore, a plaintiff and comparator do not have to be similarly situated in every way, but they must be the similarly situated in all *material* ways. Conduct, this court made clear in *Lewis*, is a material way in which a plaintiff and comparator must be similarly situated. *Id. See also Silvera v. Orange County School Board*, 244 F. 3d 1253, 1259 (11th Cir. 2001) (holding that the nature of the offense committed is "one of the most important factors in the disciplinary context"). As such, any valid comparator must have engaged in the "same basic conduct" as the plaintiff.

### E. Appellee's Conduct

#### 1. Frequency of "codes" in 24-hour period

Under *Lewis*, the Appellee was required to show at trial that show that she and her proposed comparators engaged in the "same basic conduct" as the Appellee. As the evidence at trial showed, the conduct that led to the Appellee's termination was a lack of oversight that led to a series of critical events that occurred during on November 15, 2015. This was not a sequence of two or three inconsequential events. Rather, the record indicated that an astounding 15 different "codes" or emergencies

26

were called by staff at the Broward facility over a 24-hour period – codes that threatened not only the safety of the children, but the staff and the entire facility itself.  Codes that were indicative of a possible loss of control at the facility under the direct supervision of Ms. Tynes.

### 2.    Types of "codes" called in 24-hour period

These 15 codes that were called in that 24-hour period included 13 different "code blue" calls.  Code blue calls are those that involve a detention officer calling for help.  The record indicates that the 13 code blue calls made on November 15, 2015, were detention officers calling for assistance to stop fights and altercations between juveniles, and between juveniles and staff members.  These fights led to the Fort Lauderdale Police Department being called twice that day to reestablish order at the facility, emergency medical services being called, and both youth and staff members being injured.

In addition to the blue codes, there was also one "code green" call, and one "code white" called on that day.  Code green calls are those involving an escape attempt, and code white calls are those that indicate a mental health issue or suicide attempt.  The record clarifies these codes and indicates there was an escape attempt in the boy's module on that day, and a "cutdown" scenario where a youth with sheets

wrapped around him was threatening suicide and had to be cutdown from those sheets.

### F.    The Proposed Comparators' Conduct Was Not the "Same Basic Conduct" as Appellee

The trial court erred in denying Appellee's Rule 50 Motions for Judgment as a Matter of Law on the comparator issue.  Indeed, in its rulings on both the original JMOL and the Renewed JMOL, the trial court did not even attempt to examine whether the evidence established that Appellee's comparators engaged in the same basic conduct as Appellee.  Rather, the trial judge simply stated that the credibility of the witnesses was for the jury to decide.  However, this is an incorrect standard, as the credibility of the witnesses was not the issue.  The issue was whether the evidence established that the comparators engaged in the same basic conduct as Appellee.  The evidence in no way established the comparators' conduct was essentially the same as the Appellee, and no reasonable and fair-minded person could find that it was.

### 1.    The Conduct of Daryl Wolfe

Daryl Wolfe did not even remotely engage in the same basic conduct as Ms. Tynes.  The evidence showed that Wolf was involved in two separate, isolated incidents that in no way threatened the safety of the youth, staff, or facility that she

28

supervised – or led to codes even being called.  First, Ms. Wolfe repeated an inappropriate comment that she heard a youth say while she was in a staff meeting.  Second, Ms. Wolfe allowed youth in her facility to spray paint murals in a facility  a hallway, and had the mural painted over once her assistant pointed out some of the gang signs.

Wolfe's conduct was in no way similar in frequency.  Tynes' facility had 15 codes called in a single day, as opposed to no codes being called at Wolfe's facility.  Wolfe's conduct was also not similar in type.  Thirteen of the codes called on that fateful day at Tynes' facility related to fights.  These fights led to injuries to both staff and youth, EMS services being called, and outside law enforcement being dispatched to reestablish order at the facility.  Additionally, codes for an escape attempt, and a threat of suicide were also called on that day.  There is no evidence or, indeed, allegation, that such kind of conduct occurred at Wolfe's facility.

### 2.    The Conduct of Joseph Seeber

Furthermore, Joseph Seeber did not engage in the same basic conduct as Ms. Tynes.  With regard to Mr. Seeber, the evidence showed that two different incidents happened under his watch.  First, a young lady who was being transported to the hospital escaped from the custody of two staff personnel during the transport process, and Seeber provided timely notice of the escape.  It was an isolated incident

29

that did not occur at the facility.  Second, another isolated incident occurred where a youth with a history of problems committed suicide at Seeber's facility, and Seeber immediately reported to the facility and contacted the CCC regarding the incident. While these incidents are tragic, they are in no way the "same basic conduct" as that related to Tynes.

With regard frequency, there were two cited incidents that happened to Seeber over a period of time.  With Tynes, 15 codes were called at her facility over a 24-hour period.  Thus, the frequency of incidents is wildly different.  The type of conduct involved also dissimilar.  Thirteen of the codes called on November 15, 2015, at Ms. Tynes' facility dealt with fighting and required the intervention of an outside law enforcement agency to gain back control of her facility.  With Seeber, there were no fights under his supervision mentioned at trial, and it was never alleged that control of his facility was threatened at any time.  Again, there were only two isolated incidents.

The evidence at trial clearly established that 15 codes called in a day is not only unusual, but the regional director at the time testified that she had never experienced that many codes in that period of time at any other facility. Furthermore, she testified that it was a sign of a serious concern.

### G.    "Same Basic Conduct" Is Strictly Construed

#### 1.    "Worse" Conduct Is Not "Same Basic Conduct"

##### a.    The holding in *Blash v. City of Hawkinsville*

One instructive case is *Blash v. City of Hawkinsville*, 856 Fed. Appx. 259 (April 21, 2021), where this Court held that a valid comparator cannot have engaged in worse conduct than the plaintiff, as worse conduct is, by definition, different conduct.  *Blash* involved a situation where a black deputy sheriff advised a personal acquaintance to "stay away" from a person the deputy thought was the target of a "sting" operation.  856 Fed. App'x. at 261.  The deputy did not know that the target of the sting operation was actually a confidential informant providing information to law enforcement.  *Id.*  When his supervisors found out about the deputy's statement to his acquaintance, he was fired for interfering with an investigation.  *Id.* at 262.

The deputy filed an employment discrimination lawsuit, alleging that he was actually fired due to his race.  *Id.*  His proposed comparators were two Caucasian deputies who were accused of using excessive force during the arrest of an African-American man.  *Id.* at 264.  According to the deputy, the sheriff postponed any disciplinary action against the Caucasian deputies until an investigation into the incident by an outside agency was completed.  *Id.*  Ultimately, the Caucasian

31

deputies were cleared of all charges. *Id.* The district court held that the proposed Caucasian comparators were not "similarly situated" and were, therefore not valid comparators. *Id.* The deputy appealed. *Id.* at 262.

The Court agreed that the comparators were not "similarly situated in all material respects," as they had not "engaged in the same basic conduct as the plaintiff." *Blash*, 856 Fed. Appx. at 264. The black deputy was accused of interfering with an ongoing federal investigation by warning a personal acquaintance to stay away from the subject of the investigation. *Id.* This conduct, the Court said, was not remotely similar to the Caucasian deputies' alleged use of excessive force against a civilian during the course of an arrest. *Id.* at 264-65.

The plaintiff argued that the Caucasian deputies were valid comparators because they received better treatment even though they were accused of a more serious offense. *Id.* at 265. Crucially, the Court noted that this, alone, showed that the proposed comparators' conduct was different. *Id.* The Court said: "[The plaintiff's] insistence that the Caucasian deputies' conduct was worse than his *merely highlights the fact that their conduct was different* – and 'treating different cases differently is not discriminatory, let alone intentionally so.'" *Id.* at 265 (emphasis added). Consequently, the Eleventh Circuit affirmed the district court's ruling that the Caucasian deputies were not valid comparators. *Id.*

### 2.     Some Same Conduct Is Not "Same Basic Conduct"

#### a.     The holding in *Luke v. University Health Services, Inc.*

Another case that underscores this Court's strict construction of "same basic conduct" standard is *Luke v. University Health Services, Inc.*, 842 Fed. Appx. 503 (11th Cir. 2021). Ramonica Luke was an African-American female who worked the night shift at hospital as a patient care assistant. *Id.* at 505. From 2006 to 2016, Luke accumulated a lengthy disciplinary record for tardiness and attendance problems. *Id.* She was given many written warnings and, in September of 2016, was given a final warning stating that the next occurrence of tardiness would result in her immediate termination. *Id.*

On December 31, 2016, Luke's supervisor received an email from Luke's co-worker stating that Luke was late. *Id.* The next day, the supervisor investigated various items to confirm Luke's tardiness, including security footage, employee badge history and a time adjustment sheet, which documented an employee's hours when an employee forgot to clock in. *Id.* at 505-06. During the investigation, the supervisor found what she believed were irregularities in Luke's time adjustment sheet on the date in question. *Id.* The supervisor believed the time had been falsified, but could not prove or disprove it. *Id.* Luke was terminated shortly thereafter based upon her attendance. *Id.*

33

Luke filed a Title VII lawsuit for racial discrimination. *Luke*, 842 Fed. App'x. at 506. The hospital moved for summary judgment, which was granted. *Id.* Luke appealed. *Id.*

In presenting her case for discrimination, Luke offered eight proposed comparators. *Luke*, 842 Fed. App'x. at 507-08. All of the proposed comparators were white, had a history of attendance problems, and worked for the same supervisor. *Id.* However, none had been fired for those attendance problems. *Id.*

This Court held that Luke's comparators were not "similarly situated in all material respects" to her. *Luke*, 842 Fed. App'x. at 507-08. Specifically, it noted that Luke's supervisor never suspected the comparators of falsifying time records. *Id.* The Court recognized that Luke was not ultimately fired because of her suspected falsification of the time adjustment sheet; however, her supervisor's perception that Luke falsified the time sheet is what led the supervisor to recommend termination. *Id.* Therefore, the district court's ruling was affirmed.

In *Luke*, the proposed comparators engaged in *some* of the same behavior as the plaintiff – they all had a history of tardiness. Indeed, Luke was even terminated for tardiness. However, none of the proposed comparators had been suspected of falsifying time records. In that regard, *Luke* stands for the proposition that even if a proposed comparator engages in some of the same conduct, this does not meet the

34

standard of "the same basic conduct." If a plaintiff is fired for specific conduct, a comparator must have engaged all of the same basic conduct a plaintiff did, or they are not a valid comparator.

### a.    Holding in *Ward v. Troup County School District*

Another case that indicates just how close the conduct of a proposed comparator must be to that of a Title VII plaintiff is *Ward v. Troup County School District*, 856 Fed. App'x. 225 (11th Cir. 2021). In *Ward*, a black male served as a principal at a middle school. *Id.* at 226. His supervisors received several complaints about his performance and lack of professionalism from teachers. *Id.* Thereafter, two specific incidents took place.

First, the principal completed annual teacher evaluations for six teachers without first performing a formal classroom observation, which was required under district procedures. *Ward*, 856 Fed. App'x. at 226. Second, he sent an email to faculty and staff in which he complained that some teachers were relying on him too heavily to maintain control of their classrooms. *Id.* The principal also told the recipients of the email to "decide if teaching is for you and what you need to be successful or find … another profession." *Id.*

In response to the email, the principal was placed on a professional development plan and, ultimately, was not re-employed as a principal. *Ward*, 856

35

Fed. App'x. at 226-27. Instead, he was reassigned to teach physical education at another elementary school. *Id.* at 227. Subsequently, the former principal filed a Title VII action against the school district alleging, *inter alia*, that his re-assignment was based upon race discrimination. *Id.* The district court granted the school district's motion for summary judgment, and the former principal appealed. *Id.*

In support of his claims for race discrimination, the plaintiff identified six white female principals as purported comparators. *Ward*, 856 Fed. App'x. at 228. However, the Court stated that these proposed comparators were not "similarly situated in all material respects" to the plaintiff because none of them sent an unprofessional school-wide email, and none completed teacher evaluations without performing the required observations. *Id.* Thus, this Court affirmed the district court's decision. *Id.* at 230.

This Court did not outline the exact behavior that the plaintiff's six proposed comparators engaged in, but that is quite telling. The Court focused solely on the plaintiff's conduct and then determined that since the six proposed comparators did not engage in that same basic conduct, they were not proper comparators. As such, it is clear that this Court's interpretation of the "same basic conduct" standard is a strict standard, and not to be interpreted loosely.

The similarly situated standard required the Plaintiff to provide evidence of another Superintendent who was responsible for a facility that experienced numerous codes in a single day.  Instead, the Plaintiff relied on evidence of isolated events, some of them trivial others tragic, but none of them similar to the events of November 15.  Thus, the trial court should have granted the Rule 50 or 59 motion.

## II.    APPELLANT DID NOT PROVE AN ESSENTIAL ELEMENT OF A 42 U.S.C. § 1981 CLAIM

### A.    Burdens of Proof for Title VII and §1981 Are Different

#### 1.    Title VII's "Motivating Factor" Test Means Race Is *a* Cause of Termination

In employment discrimination lawsuits, plaintiffs can assert claims of race discrimination under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981 of the Civil Rights Act of 1866.  Title VII is the federal employment statute prohibiting discrimination based on all protected classes, including race and sex. Section 1981, on the other hand, is not an employment statute, but it does encompass employment-based race discrimination claims.  The reason plaintiffs often assert race discrimination claims under §1981 in their complaint is that, unlike Title VII, Section 1981 has a longer statute of limitations and there are no caps on the plaintiff's damages.

37

It is crucial to note that while Title VII and §1981 claims have some similarities, they are entirely separate and distinct causes of action. As such, they have very different burdens of proof. In a claim under Title VII of the Civil Rights Act of 1964 for race or sex discrimination, a plaintiff must show that race (or sex) was a "motivating factor" in her termination. 42 U.S.C. §2000e-2(m). *See also Gross v. FBL Fin. Servs, Inc.*, 129 S. Ct. 2343, 2349 (2009). In other words, race must be a motivating factor in a plaintiff's termination, but there can be other motivating factors, as well. However, a claim under §1981 requires a different, much higher showing.

### 2. Section 1981's "But-For" Test Means Race Is *the* Cause of Termination

The United States Supreme Court addressed a plaintiff's burden of proof under § 1981 in *Comcast Corp. v. National Ass'n of African American-Owned Media*, 140 S. Ct. 1009 (2020). In *Comcast*, a unanimous court held that in order for a plaintiff to prevail in a §1981 claim, the plaintiff bears the burden of showing that the plaintiff's race was the "but-for" cause of her injury. In other words, a plaintiff must demonstrate that race was *the* reason for her termination, not simply *a* reason, which is the standard for Title VII. Significantly, the high court noted that in general tort law, the "essential elements" of a claim remain "constant through the

38

life of a lawsuit." *Id.* at 1014.  As such, with regard to a §1981 claim, "a plaintiff must initially plead and ultimately prove that, *but for* race, it would not have suffered the loss of a legally protected right."  *Id.* at 1019 (emphasis added).

### B.    Appellee Did Not Prove a § 1981 Claim at Trial

#### 1.    Appellee's First Mention of a §1981 Claim Came at Trial

As an initial matter, the Appellee's Complaint does not stylistically or substantively allege a cause of action under §1981.  The Appellee's Complaint contains only two counts.  Count I is titled: "Racial Discrimination Under Title VII Against Florida Department of Juvenile Justice."  Count II is titled: "Sex Discrimination Under Title VII Against Florida Department of Juvenile Justice." Thus, no count or stylistic heading anywhere in the Complaint indicates that Appellee intended to pursue a cause of action against Appellant for a violation of §1981.  Additionally, the Appellee did not mention she was pursuing a §1981 in any section of the Joint Pretrial Stipulation relating to trial-related matters.

The first mention Appellee made of her intention to pursue a §1981 claim came in Appellee's opening statement, when her counsel stated: "[w]e also sued under a statute of 42 U.S.C. §1981, which, in essence, says that there is no cap …" Appellant's counsel immediately objected and, at a sidebar, stated that the grounds

for the objection were that it was argumentative, "and that's not the cause of action." The court overruled the objection, stating: "I'll tell the jury what the law is at the end of the case.  What the lawyers say isn't the law.  You may continue, Mr. Miller." Thus, the court erred in permitting the jury to hear anything about a §1981 claim, as it had not been pled and was not mentioned in the Joint Pretrial Stipulation.

### 2.    Appellee Never Argued "But-For" Causation at Trial

Even if the jury did properly hear that Appellee was pursuing a §1981 claim, the Appellee did not state she intended to prove the essential element of §1981 claim – "but-for" causation.  The purpose of an opening statement is to advise the jury of the facts of the case.  *United States v. Adams*, 74 F. 3d 1093 (11th Cir 1996). Nowhere in her opening statement did Appellee state that she was going to show that race was the "but-for" cause of her termination, as is required to be proven under *Comcast*.  It is telling that Appellee only mentioned §1981 in relation to an award of uncapped damages.

Despite referring to §1981 once in her opening statement, Appellee offered no testimony or other evidence to prove the essential element that race was the "but for" cause of her termination which, again, is required under *Comcast*.  Indeed, Appellee's own testimony indicated that she felt she was treated differently because of her "race and gender", which is consistent with Title VII claim, not a §1981 claim,

40

which is exclusively a race-based claim.  [TT: 3-29, 30].  Quite simply, "but-for" causation was not a part of the evidence or testimony presented by Appellee at trial.

Highlighting this point, Appellee did not mention that the essential "but-for" element had been proven at trial either.  "The sole purpose of closing argument is to assist the jury in analyzing the evidence." *United States v. Iglesias*, 915 F. 2d 1524, 1529 (11th Cir. 1990).  In her closing argument, Appellee again mentioned §1981 only once – to say that it provided for unlimited damages.  Nowhere in her closing argument did Appellee state that the evidence showed that she proved race was the "but-for" causation of her termination.

When Appellee rested her case, Appellant immediately filed a Motion for Judgment as a Matter of Law regarding the §1981 issue.  Specifically, Appellant's Motion for Judgment as a Matter of Law argued that Appellee did not plead or prove a violation of §1981.  The trial court denied the Appellant's Motion.

### C.    No Reasonable Jury Could Find Appellee Proved a §1981 Claim

As mentioned *supra*, Appellee did not plead the "but-for" causation in any pleading.  Additionally, she did not mention "but-for" causation in her opening statement, did not prove "but-for" causation at trial, and did not even assert in her closing argument that "but-for" causation had been shown.  Nevertheless, the jury specifically found that Appellee's race was the "but-for" cause of Appellee's

41

termination by Appellant. Since no reasonable jury could have found "but-for" causation, Appellant moved for a Renewed Motion for Judgment as a Matter of Law Or, Alternatively, a Motion for New Trial.

In its Renewed Motion for Judgment as a Matter of Law, Appellant once again argued that Appellee failed to plead a cause of action under §1981, that Appellee waived her ability to bring a §1981 claim by not mentioning such a claim in the Joint Pretrial Stipulation, and that she failed to prove a §1981 claim at trial arguing the verdict was inconsistent. As mentioned *supra*, the jury found that Appellee's race was the "but-for" cause of her termination. However, it also simultaneously found that she was fired due to her race *and* sex under Title VII.

### D. Appellant Was Prejudiced by Not Knowing Appellee Intended to Pursue a §1981 Claim Until Trial

The Appellant was prejudiced by the trial court allowing the Appellee to present a §1981 claim at trial. By not knowing of the Appellee's §1981 claim prior to trial, Appellant was unable to address the §1981 claim in the pre-trial stage of litigation. For instance, Appellant was not able to file a motion for summary judgment, as it filed in relation to the Appellee's Title VII claims. Additionally, Appellant was unable to focus on "but-for" causation in discovery, including an

42

inability to elicit deposition testimony specifically relating to "but-for" causation – which is a different standard of proof than a Title VII claim.

Additionally, Appellant did not have an opportunity to develop a different trial strategy – particularly since §1981 claims have no cap on damages. The strategy used in a case where the highest potential loss is $300,000 in damages would differ significantly from the strategy used in a case where the potential loss is unlimited. Myriad details throughout all stages of litigation would have been altered to address a case with a different damage threshold and a different standard of proof. In short, Appellant was prejudiced, as the case it prosecuted and prepared for was not the case it ended up trying.

43

## CONCLUSION

FDJJ respectfully request that this Court reverse the trial court's denial of its Rule 50 motion and remand with instructions that judgment should be entered for FDJJ or, alternatively, that a new trial should be granted.


Respectfully submitted,
Carri S. Leininger, Esq.
Florida Bar No.:  0861022
Jayme Sellards, Esq.
Florida Bar No.: 60066
Williams, Leininger & Cosby, PA
11300 US Highway One, Suite 300
N. Palm Beach, FL 33408
**Counsel for Appellant**


By:   s/Carri S. Leininger
                                           

Florida Bar No. 0861022

44

**CERTIFICATE OF COMPLIANCE**

We hereby certify that this brief complies with the type-volume limitation of

Federal Rule of Appellate Procedure Rule 32(a)(7) in that it contains 8,943 words

(including words in footnotes) according to Microsoft 365, the word processing

system used to prepare this brief.

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the Initial Brief of

Appellant was furnished via CM/ECF and via UPS upon the following clerk of court

on this 10th day of February 2022.

> David J. Smith, Clerk of Court
> U.S. Court of Appeals for the 11th Circuit
> 56 Forsyth St. N.W.
> Atlanta, GA 30303

WE HEREBY CERTIFY that a true and correct copy of the foregoing was

filed with the Clerk of Court through the CM/ECF system and furnished via U.S.

Mail upon the following counsel this 10th day of February, 2022:

**Service List**

Glenn R. Miller, Esq.
Glenn Ricardo Miller, LLC.
67 N.E. 168th Street
North Miami Beach, FL 33162
Email: grmpalaw@gmail.com
Phone Number: 305.651.5991
Counsel for Appellee