No. 21-13245-H

---

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

Florida Department of Juvenile Justice,

*Defendant-Appellant-Employer,*

v.

Lawanna Tynes,

*Plaintiff-Appellee-Employee.*

---

On Appeal from the United States District Court, Southern District of Florida
Case No. 18-CV-62891 WPD

---

**APPELLEE'S ANSWER BRIEF**

---

Glenn R. Miller (FL Bar 539376)
GLENN RICARDO MILLER, LLC
67 N.E. 168th Street
N. Miami Beach, FL  33162
Tel: 305-651-5991
Email: grmpalaw@gmail.com
*and*
Arnaldo Vélez (FL Bar 149589)
ARNALDO VÉLEZ, P.A.
35 Almeria Avenue
Coral Gables, Florida 33134
Tel: 305-461-9499
avelez@velezlawoffices.com

*Co-counsel for Plaintiff-Appellee*

No. 21-13245-H

*Florida Department of Juvenile Justice v. Lawanna Tynes*

## Certificate of Interested Persons and Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, I hereby certify that the following persons may have an interest in the outcome of this case:

## Certificate of Interested Persons

1.      Arnaldo Vélez, P.A.

2.      Dimitrouleas, William, United States District Court Judge

3.      Florida Department of Juvenile Justice (Stock Ticker: none)

4.      Leininger, Carri S.

5.      Miller, Glenn

6.      Sellards, Jayme

7.      Snow, Lurana, United States District Court Magistrate Judge

8.      Tynes, Lawanna

9.      Vélez, Arnaldo

10.     Williams, James, O., Jr.

11.     Wiseberg, Philip

12.     Williams, Leininger & Cosby, P.A.

## __Corporate Disclosure and Certification__

Florida Department of Juvenile Justice is a state agency of Florida. As a result, no publicly traded company or corporation has an interest in the outcome of the case or appeal.

## **Statement Regarding Oral Argument**

Appellee respectfully requests oral argument and submits it may be of assistance to the Court. The jury trial lasted six days and included numerous witnesses and exhibits spanning sixteen years of employment. Appellee believes it may be helpful to the court to have counsel available to address questions the court may have about the records and issues on appeal.

# Table of Contents

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement....... C-l - C-2

Statement Regarding Oral Argument............................................................ iii

Table of Contents........................................................................................ iv

Table of Citations........................................................................................ v-vii

Statement of the Issues................................................................................ viii

Statement of the Case and of the Facts........................................................ 1-22

Summary of the Argument........................................................................... 22-23

Argument ................................................................................................... 23

      I.     WHETHER MS. TYNES FAILED TO PROVE HER TITLE VII CLAIMS FOR RACE AND SEX DISCRIMINATION......................................................... 23-31

      II.    WHETHER MS. TYNES PRESENTED SUFFICIENT EVIDENCE FOR CONSIDERATION OF A CLAIM UNDER §1981 AND WHETHER THE TRIAL COURT COMMITTED ERROR IN ALLOWING AN AMENDMENT TO ALLOW A CLAIM UNDER §1981.................................................................. 32-36

Conclusion.................................................................................................. 36

Certificate Of Compliance with Type-Volume Limit.................................... 37

Certificate Of Service.................................................................................. 38-39

# Table of Citations

| Cases | Page(s) |
|---|---|
| *Bass v. Bd. of County Comr's. Orange Co., Fla.*<br>256 F. 3d 1095 (11th Cir. 2001) | 24 |
| *Blash v. City of Hawkinsville*<br>856 Fed, Appx. 259 (11th Cir. 2021) | 30 |
| *Bowie v. Automax Used Cars, LLC*<br>No. CIV-21-393-D, 2021 WL 5065852, at 2<br>(W.D. Okla. Nov. 1, 2021) | 35 |
| *Chapman v. A1 Transport*<br>229 F. 3d 1012 at 1024 (11th Cir. 2000) | 26 |
| *Chmielewski v. City of St. Pete Beach*<br>890 F.3d 942, 948 (11th Cir. 2018) | 24 |
| *Comcast Corp v. National Ass'n of African American Owned Media*<br>589 US ____,  140 S. Ct. 1009 (2020) | 33 |
| *Coffman v. Chugach Support Services, Inc.*<br>411 F. 3d 1231 (11th Cir. 2005) | 27 |
| *Denney v. City of Albany*<br>247 F. 3d 1172 (11th Cir. 2001) | 24, 25 |
| *Dep't of Community Affairs v. Burdine*<br>450 U. S. 248, 101 S. Ct. 1089 (1982) | 25 |
| *EEOC v. Joe's Stone Crab*<br>220 F. 3d 1263 (11th Cir. 2000) | 24 |
| *Foman v. Davis*<br>371 U.S. 178 (1962) | 32 |

*Harris v. Shelby County Bd. Of Educ.*                                24, 26
99 F. 3d 1078 (11th Cir. 1996)

*Holifield v. Reno*                                                          25
115 F. 3d 1555 (11th Cir. 1997)

*Jefferson v. Sewon America, Inc.*                                          24
891 F.3d 911 (11th Cir. 2018)

*Jenkins v. Nell*                                                    24, 25, 28
26 F. 4th 1243 (11 Cir. 2022)

*Kim v. Nasa Finch*                                                          32
123 F. 3d 1046 (8th Cir. 1997)

*Lewis v. City of Union City*                                        28, 29, 30
934 F. 3d 1169 (11th Cir. 2019)

*Lewis v. City of Union County, Aa.*                                 23, 25, 27
918 F. 3d 1213 (11th Cir. 2019)

*Luke v. Univ. Health Servs., Inc.*                                          26
842 F. App'x 503 (11th Cir. 2021)

*McDonnell Douglas Corp. v. Green*                                       25, 27
411 U. S. 792, 93 S. Ct. 1817 (1973)

*Menefee v. Sanders Lead Company*                                            28
786 Fed. Appx 963 (11th Cir. 2019)

*Mosley v. Preston Cycles West, LLC.*                                        29
2021 WL4815901, 17  (N. D. Ga. 2021)

*R&R Ground Maint. Inc. v. Ala. Power Co.*                                   26
713 F. App'x 853 (11th Cir. 2017)

*Reeves v. Sanderson Plumbing Products, Inc*.                    26
530 U. S. 133, 120 S. Ct. 2097 (2000)

*Ritchie v. Indus. Steel, Inc*.                    26
426 F. App'x 867 (11th Cir. 2011)

*Sands v. Kawasaki Motors Corp, U. S. A*.                    34
513 Fed. Appx. 847 (11th Cir. 2013)

*Schiavone v. Fortune*                    32
477 U.S. 21, 106 S. Ct. 2379 (1986)

*Silverman v. Bd. of Educ. of City of Chi*.                    28
637 F.3d 729 (7th Cir. 2011)

*Smith v. Lockheed-Martin Corp.*                    28, 29
644 F.3d at 1321 (11th Cir. 2011)

*Walls v. Button Gwinnett Bancorp., Inc*.                    26
1 F. 3d 1198 (11th Cir. 1993)

**Statutes**

42 U. S. C. §1981                    2, 24

## Statement of the Issues

I.     WHETHER MS. TYNES FAILED TO PROVE HER TITLE VII CLAIMS FOR RACE AND SEX DISCRIMINATION

II.    WHETHER MS. TYNES PRESENTED SUFFICIENT EVIDENCE FOR CONSIDERATION OF A CLAIM UNDER §1981 AND WHETHER THE TRIAL COURT COMMITTED ERROR IN ALLOWING AN AMENDMENT TO ALLOW A CLAIM UNDER §1981

## <u>STATEMENT OF THE CASE AND OF THE FACTS</u>

Following a six day trial wherein a jury rendered a special verdict materially finding:

(1) That Lawanna Tynes' (Ms. Tynes) race or sex was a motivating factor that prompted The Florida Department of Juvenile Justice ("The Department") to terminate her employment;

(2) That The Department would not have discharged Ms. Tynes from employment even if the Florida Department of Juvenile Justice had not taken Ms. Tynes' race or sex into account;

(3) That Ms. Tynes' race was the "but for" cause of The Department's decision to terminate her employment;

(4) That Ms. Tynes should be awarded damages in the sum of $424,600 for a net loss of wages and benefits to the date of the verdict;

(5) That Ms. Tynes should be awarded damages to compensate for emotional pain and mental anguish in the sum of $500,000;

on which a judgment was entered July 27, 2021.[1]

The jury instructions included a directive requiring Ms. Tynes to have shown that race was the "but for" cause of her termination to which Defendant lodged an objection.[2]

_____

[1]     D.E. 119.

[2]     D.E. 120.

1

Post trial Appellant renewed a Rule 50(b) motion made at the close of trial arguing that the comparators presented by Ms. Tynes were insufficient to establish a claim under Title VII of the 1964 Civil Rights Act and that Ms. Tynes had not properly plead or proven a race discrimination action under 42 U. S. C. §1981 as there was no evidence that race was the "but for" cause of the termination of her employment.[3]  This motion was denied by an order entered August 27, 2021, determining that the circumstantial evidence regarding the two comparators was sufficient to establish the discrimination claim and that credibility was for the jury to decide.  Regarding the §1981 claim, the trial court observed that Appellant was clearly on notice in portions of the Complaint and during opening statement that Appellee was also proceeding on §1981, and with no prejudice having been shown regarding an amendment to Plaintiff's claim, the Court denied Defendant's motion by entering an order on August 27, 2021.[4]

---

[3]    D.E. 141. Pre-trial through a Motion for Summary Judgment, The Department had pursued a ruling on comparators with the Court entering a May 29, 2020, order (D.E. 61) determining that Joseph Seeber, a white male who at one was the superintendent of the final facility at which Ms. Tynes worked, and Daryl Wolf, a white female and superintendent at a Miami facility, qualified as proper comparators.

[4]    D.E. 143.

An amended Final Judgment was entered on September 8, 2021, confirming the entry of the prior money judgment, and adding that Ms. Tynes was to be reinstated at a similar position outside of detention with the same pay of $73,129.94 and benefits that would have accrued but for the discrimination and lack of supervision by Assistant Secretary Dixie Fosler, Ms. Tynes' immediate supervisor at the time of her dismissal. Appellant's September 21, 2021, Notice of Appeal followed.[5]

**The Department**.

Evidence at trial showed the Department operates detention facilities for minors in various counties around the State. Facilities differ in size, layout, number of intakes that each may hold, internal facilities, the number of employees required to operate a facility, and services which are allotted to the facility and the detainees, which include maintenance personnel and services, supplementation for medical relief of inmates, and techniques that may be used at the site in dealing with inmates. A grading system is used by the Department in identifying each detention center ascribing each facility with a tier number, 5 being the largest.[6] Key West was a tier

---

[5]    D.E. 146 and 152.

[6]    D.E. 36.

3

3, Collier was a tier 2,   and Dade County and Broward Tier 5.[7]   In 2015, there were 100 people on staff at Broward.[8]

Detainees often become frustrated and one witness testified they use whatever tools they can to get attention.[9]

The Department has a Central Communications Center (CCC) which can be called by staff at the facilities for any reason they desire.[10] However, there are incidents such as detainees going to a hospital or an escape that must be called into the CCC.[11]

On a periodic basis, sometimes every six months, the Department carried out a review of each facility by what is known as a Quality Improvement, the acronym for which is QI. [12]  This involves a review by peers of each facility which ascribes a rating upon the review with a grading of 75 per cent being the minimum.[13]   A QI

---

[7]      TT. 2 at 73, 134.

[8]      TT. 3 at 111.

[9]      TT. 2 at 57, 60.

[10]     TT. 2 at 36, 146.

[11]     TT. 3 at 87.

[12]     TT. 2 at 36, 39, 70-71, 144, 145, 149.

[13]     TT. 2 at 70-71.

report, circulated to regional directors around the State and the main office, may result in a prescription that something is wrong and must be corrected which upon correction results in another review.[14] A month or two, sometimes three, are afforded to correct whatever is wrong.[15]

Another audit undertaken by the Department is the PREA (Prison Rape Elimination Act) audit. It is similar to QI with auditors coming in and going over some 30 or 40 standards and results in a major report which normally takes up to year to be able to pass.[16]

Another report that is prepared by The Department is known as Technical Assistance Report (TA) brought about by the assistant secretary and regional director sending a team to determine what issues a facility may be having and to advise and assist in providing a solution.[17]

The department also issues what is known as an inspector general report (IG) if it looks into an incident.[18]

---

[14]     TT. 2 at 70.

[15]     TT. 2 at 71.

[16]     TT. 2 at 79.

[17]     TT. 2 at 121.

[18]     TT. 2 at 83, 120; TT. 4 at 126.

**Ms. Tynes**.

Ms. Tynes is black and was in the employ of The Department since November of 1999, initially under the designation of a Career Worker I for five years in the Key West facility which operated a two man temporary cell along with home detention using electronic monitors.[19] Ms. Tynes would also transport detainees from Key West to the Miami-Dade Detention Center.[20] In 2004, a new Key West facility was opened and Ms. Tynes' duties changed to manning the floor, intaking, releasing, caring and taking custody of detainees.[21]  An area of this facility, identified as *the Mod*, was where the detainees would live and where, among other things, they slept and attended classes.[22] Ms. Tynes rose in the ranks, becoming a supervisor at the facility, whose responsibility was to oversee the operation of the facility, ensure safety and security for all children and staff at the facility.[23]  There she would initially work as a Career Worker I for five years.[24]

---

[19]     TT. 2 at 68.

[20]     TT. 2 at 68.

[21]     TT. 2 at 68-69.

[22]     TT. 2 at 69-70.

[23]     TT. 2 at 70.

[24]     TT. 2 at 68.

Ms. Tynes began working at both the Monroe County and Collier County facilities from June 2013 until December of 2013.  In December of 2013, she left permanently to Collier County.[25]

At Collier, Ms. Tynes became a superintendent and served there two years. While at Collier she was also requested to travel to Broward to assist that facility that had failed its QI. [26]  The superintendent at the Broward facility was Joseph Seeber. By then, Ms. Tynes had been given credentials to train staff regarding medical and mental health.[27]

 At the urging of Dr. Gladys Negron, a supervisor, Ms. Tynes applied for the Superintendent's post at Broward County and received the job in August of 2015 through an order that was signed off by Dr. Negron and Dixie Fosler, Assistant Secretary of the Department.[28]  Ms. Tynes remained at the Broward facility from August 24, 2015, until December 11, 2015, when she was terminated.  On September 28, 2015, while at a superintendent meeting in Tallahassee, Ms. Tynes was

---

[25]    TT. 2 at 72.

[26]    TT. 2 at 74.

[27]    TT. 2 at 74.

[28]    TT. 2 at 75-76.

recognized as Superintendent of the Year for the Collier County location.[29]    The
recognition was signed off by Dixie Fosler.

On moving to the Broward facility, Ms. Tynes found that the facility was
understaffed resulting in workers working overtime in their shifts, that it needed
trainers for staff to perform appropriate intakes of detainees, and that it needed
replacement of furniture, doors, and locks. Ms Tynes also found that the air
conditioning was faulty in some of the areas where detainees were required to sleep,
requiring that doors be left open to allow for appropriate venting.[30] Ms Tynes trained
the staff and was able to pass a PREA audit the first time.[31]

On one occasion, when Ms. Tynes was not present at the facility some
detainees who were scheduled to participate in a program and didn't want to go,
barricaded themselves inside their rooms and the doors could not be opened from the
outside.[32] She arrived at the facility in the morning and between she and another
employee persuaded the detainees to leave their room.[33]    Ms. Tynes reported the

---

[29]    TT. 2 at 76.

[30]    TT. 2 at 55, 56, 60, 77.

[31]    TT. 2 at 80.

[32]    TT. 2 at 81.

[33]    TT. 2 at 81-82.

8

incident to the CCC. No QI report was issued regarding this incident.[34] At no time has Ms Tynes failed a QI regarding any of the facilities where she served.[35]

On Sunday, November 15, 2015, when Ms. Tynes had remained at home on the recommendation of her doctor, a series of incidents occurred at Broward. Records showed what are called various calls were made by officers that are identified as codes: code blue being one of an officer calling for help, code white being one arising from a detainee having a medical issue or involving a suicide, and code green indicating an escape or attempted escape by a detainee.[36]

The events of November 15, 2015 were not called into the CCC until the following day.[37]

On Monday Dr. Negron, Ms. Tynes' supervisor, informed her that a conference call would occur with Dixie Fosler, Joe Graham, Yessica Mederos (Ms. Tynes' assistant), Jorge Guerra and Cleo Burks on November 16, 2015.[38] After the conference call Ms. Fosler informed Ms Tynes that she wanted one person from

---

[34]     TT. 2 at 83.

[35]     TT. 2 at 104.

[36]     TT. 2 at 84; TT. 3 at 72-82, 98.

[37]     TT. 3 at 91.

[38]     TT. 2 at 86.

region staff to be present at the facility every day but Ms. Tynes was not informed that a TA team was being assembled by Dixie Fosler and would be visiting the facility.[39]    Dixie Fosler arranged for a technical assistance team appear at the Broward facility to review staffing and personnel issues and to review management of the facility.[40]

On November 17, 2015, Tom Mahoney the quality improvement reviewer made an unannounced visit to the Broward Facility.[41] On November 30th a Tactical Assistance Team appeared at the facility and remained until December 4, 2015.  Ms. Tynes was dismissed on December 11, 2015.[42]

Regarding Ms. Tynes' dismissal the jury heard from Dixie Fosler and Dr. Negron.

Ms. Fosler's testimony included:

---

[39]    TT. 2 at 86.

[40]    TT. 3 at 11.

[41]    TT. 3 at 9.  Regional staff which before then would come all the time to the facility and assist Ms. Tynes, came in every day to provide support and assistance.  Appellant' brief at page characterizes the visits as arising from concern, which concern caused the Regional Staff to be present. That characterization is not supported by the transcript.

[42]    TT. 3 at 9.

- Stating that although she had signed the certificate awarding Ms. Tynes as superintendent of the year she felt that Ms. Tynes did not deserve it.[43]

- That she opined that Ms. Tynes did not fulfill the responsibilities required by the Florida administrative code for a superintendent adding that Ms. Tynes' staff did not trust her, that she didn't think the kids trusted her, and that she appeared not to have an understanding of the operational processes to run a juvenile detention center.[44]

- That she had reservations on promoting Ms. Tynes from Collier to Broward but she went ahead an did it because it was what Dr. Negron wanted.[45]

- That she was not aware that Ms. Tynes was on medical leave on November 15, 2015 but to her knowledge it was Ms. Tynes day off. [46]

- That she was concerned with the 15 codes called in on November 15, 2021 because they raised the anxiety of everybody in the building, kids and staff included.[47]

- That even though Captain Burks had been found at fault for the incidents of November 15, 2015, Ms. Tynes was responsible for not ensuring that the CCC was called on the same day. Ms Tynes was responsible for "the fact that her staff did not appear to know how to manage a building that was falling apart after the first couple of codes".[48]

- That she created the four person TA team that visited Broward on November 31, 2015 which on visiting the facility were informed that five detainees had

---

[43]    TT. 4 at 71.

[44]    TT. 4 at 72-73.

[45]    TT. 4 at 74.

[46]    TT. 4 at 75.

[47]    TT. 4 at 76.

[48]    TT. 4 at 77-79.

11

barricaded themselves in their rooms and that detainees were allowed to be in their bedrooms with the doors unlocked, contrary to a directive of the Florida Administrative code. Admitting that she did not know whether some of the doors had problems with the locks and whether there were problems with the air conditioning in the rooms which required that doors be left open to allow circulation.[49]

- That Ms. Tynes should have had a relationship with outside school staff such that if a teacher that was to have been sent by the school system did not show up "you had somebody to go to talk about it." [50]

- That although Ms. Tynes tried to hire new officers to work at the facility she rejected the choices because "it would take probably a year to get a supervisor in a position where they would feel comfortable with their job and where you would be comfortable then leaving them in charge of the facility". Additionally, that it was a "bad idea" to have three brand new supervisors come on at one time in a facility but now explaining why this was so.[51]

- During her testimony she referred to the technical assistance report that has been prepared by the team she picked but that she could not recall any other circumstance when a technical assistance report had been used to terminate an employee.[52]

- That a letter of termination was prepared for signature by Dr. Gladys Negron but she knew that Dr. Negron was not in agreement with it.[53]

---

[49]    TT. 4 at 81, 82-83.

[50]    TT. 4 at 85-86. By statute, detainees are required to have a specified amount of minutes of education. TT. 2 at 59.

[51]    TT. 4 at 91-92.

[52]    TT. 4 at 122.

[53]    TT. 4 at 130.

- That it was hopeless to consider that Ms. Tynes could receive training to correct the wrongs that she determined Ms. Tynes had committed.[54]

- That Ms. Tynes was actually fired before Dixie Fosler received the final technical assistance report.[55]

- That she made the final decision to terminate Ms. Tynes.[56]

Dr. Gladys Negron, who was the director of detention services for the Department for the south region informed the jury that:

- She felt Ms. Tynes was qualified for the position of Superintendent and that she was professional, knowledgeable, had a strong work ethic and very reliable.[57]

- That on December 9, 2015 she was told by Dixie Fosler that a disciplinary package would be prepared regarding Ms. Tynes and that she was directed by Ms. Fosler to terminate Ms. Tynes.[58]

- That the package included allegations written by Ms. Fosler's office without any input from her or her office and that it included several inaccuracies of which she informed Ms. Fosler.[59]

---

[54]    TT. 4 at 136.

[55]    TT. 4 at 136.

[56]    TT. 4 at 136.

[57]    TT. 5 at 40.

[58]    TT. 5 at 42.

[59]    TT. 5 at 42-43.

13

- That the allegations used to terminate Ms. Tynes were not warranted or substantiated.[60]

- That the termination was not consonant with the disciplinary practices and latitude offered to other detention center superintendents (some who had committed significantly more egregious offenses) who were more fondly considered by Dixie Fosler.[61]

- That she had disciplined Daryl Wolf, then a major, another employee, when a QI team informed her that Ms. Wolf, a white female,  had made inappropriate statements of a racial nature regarding the QI team and when Ms. Wolf caused some detainees to spray paint an enclosed space causing the staff to go home with asthma attacks she wrote and prepared a disciplinary package on which Ms. Fosler did not discipline Ms. Wolf instead transferring her to another region.[62]  Ms. Wolf was a comparator at trial.

- That she had also attempted to discipline  Seeber, a one time superintendent of Broward who had failed a QI on whose watch a detainee escaped from the facility and whom she called and did not promptly return her phone calls.[63]

- That when the technical assistance team was arranged for by Dixie Fosler, without telling her, she questioned why they were there and was not given a straight answer and that she thought they were on a "search and kill mission" and the team was not there to assist but as some kind of set up to try to get information to terminate Ms. Tynes or herself.[64]

- That when Ms. Tynes was being considered for the Broward position she asked Dixie Fosler to provide details as to what Ms. Tynes was lacking in her

---

[60]    TT. 5 at 43.

[61]    TT. 5 at 43.

[62]    TT. 5 at 45-47.

[63]    TT. 5 at 47-48.

[64]    TT. 5 at 51, 68.

14

professional experience and what she got from her was "I don't like her. I don't think she can handle it, but [provided] no tangible information." [65]

- That she never saw the report that was prepared by the technical assistance team and when she was requested to terminate Ms. Tynes she asked what the issue was or what happened to which Dixie Fosler responded "Don't worry. I'll put it together for you." [66]

- That based upon her knowledge she had the personal belief that Ms. Tynes termination was based upon Ms. Fosler's personal feelings rather than her professional concerns about her capabilities.[67]

- That information provided by Dr. Negron weeks before in the form of daily status reports showing progress by Ms. Tynes were not referenced at all by Dixie Fosler.[68]

- That it was her professional opinion that Ms. Tynes was not afforded a satisfactory length of time to address any problems that might be present.[69]

- She questioned why a technical assistance team was need.[70]

Additionally, the jury was informed of a December 11, 2015, memorandum

prepared by Inspector General Robert Munson was positive regarding Ms. Tynes'

---

[65]    TT. 5 at 70.

[66]    TT. 5 at 51.

[67]    TT. 5 at 43.

[68]    TT. 5 at 43.

[69]    TT. 5 at 43.

[70]    TT. 5 at 50.

performance as a supervisor and his results were totally different from those of the TA team.[71]

On being questioned, Ms. Tynes admitted no one had said anything to her suggesting that she was being treated differently because of her race or gender but added that it was the treatment afforded to her that displayed that she was being treated differently from the previous superintendent directly stating that Dixie Fosler was biased against her because of her race and gender.[72]

During trial The Department wished to show that at present there were female and black superintendents but Ms. Tynes informed the jury that this was now and was not the case when she was terminated.[73]

**The Comparators**.

The jury heard from and regarding Joseph Seeber, a white male, who was an employee of the Department from October 2011 through November of 2018, acting as superintendent of Broward from mid 2013 through early 2015.[74] During his tenure at Broward the facility had staffing problems and at one point a young lady escaped

---

[71]    TT. 5 at 13-14.

[72]    TT. 5 at 29-30.

[73]    TT. 5 at 20.

[74]    TT. 5 at 21-22.

16

from the facility and although a report was written of the incident and "substantiated" the incident. Seeber had also worked at Pinellas at which a QI found that there were individual indicators that had failed and for which he was given a verbal reprimand by Dixie Fosler.[75] Seeber was never terminated and eventually moved to the Pinellas facility, also a Tier 5.[76] At this site a child passed but he was not blamed for the loss, nor was he discharged.[77] From Pinellas, Seeber was transferred by Dixie Fosler to Manatee, a tier 3 facility. He was never terminated by the Department, finishing his carrier as a detention services superintendent.[78] That which the jury heard was consistent with the Court's finding in the summary judgment order indicating:

> ...that Plaintiff has carried her burden with respect to Mr. Seeber. Mr. Seeber and Plaintiff were both Superintendents, both had serious incidents reflecting a failure to abide by FDDJ protocols during their tenures as Superintendents, and both had administrative deficiencies memorialized in operational reviews. They are therefore similarly situated in all material respects. Yet in response to Mr. Seeber's failures, he was simply transferred to different facilities, while Plaintiff was immediately subjected to review by a technical assistance team and terminated within a month. In addition, Mr. Seeber was apparently granted several opportunities to comply with the recommendations of the quality improvements reviews, but Plaintiff was allegedly never even presented with the technical assistance team's report. It appears the

---

[75]    TT. 5 at 9-10.

[76]    TT. 5 at 22-26.

[77]    TT. 5 at 26.

[78]    TT. 5 at 12.

17

*report was not even finalized until after her termination...Although Defendant relies on Secretary Fosler's affidavit for the fact that the incidents were not attributable to Mr. Seeber, this merely begs the question: why was the poor performance of Mr. Seeber's staff not attributable to his management, but the poor performance of Plaintiff's staff was not attributable to hers" Mr. Seeber is therefore and appropriate comparator.*[79]

Daryl Wolf, a white female, who served as Superintendent at the Broward facility, working briefly at Palm Beach and then working in Miami testified she had received an oral reprimand for some language she used, and that she was disciplined for a paint incident that had occurred in Miami.[80] Ms. Wolf was made to recall an incident in Miami where another employee accused her of putting her hands on her.[81] She was not terminated but transferred to Broward for a week where she failed a QI.[82]. From there she went to another facility in Orange where another QI report indicated a low rating due to "inventory management, inventory and flammable, toxic caustic, poisonous items, confinement under and over 24 hours, escape drills".[83] Ms. Wolf was not terminated over any item and Ms. Fosler was the assistant secretary of

---

[79]     D.E. 61.

[80]     TT. 5 at 86-88.

[81]     TT. 5 at 92.

[82]     TT. 5 at 92.

[83]     TT. 5 at 98.

the Department at the time. Ms. Wolf eventually retired from the Department after

working 38 years.[84]

Regarding Ms. Wolf in the order of summary judgment the lower Court made

this ruling:

> *Plaintiff proffers Daryl Wolf, a white female, as a potential comparator.*
> *Ms. Wolf was superintendent of the Miami Regional Juvenile Detention*
> *Center when she failed to correct issues brought up in her annual*
> *quality assurance reviews. Plaintiff also stated in her deposition that*
> *Ms. Wolf physically "put her hands on" another employee. Defendant*
> *asserts that these incidents are entirely different from Plaintiff's*
> *misconduct, but Defendant neglects to address an incident for which Dr.*
> *Negron stated in her deposition that she wanted to take disciplinary*
> *action against Ms. Wolf: an incident where Ms.Wolf provided youths*
> *with spray paint and permitted them to paint one of the hallways of the*
> *Miami facility, which led to several staff members having asthma*
> *attacks and the youths painting gang symbols on the walls. (ECF No.*
> *50-1). Instead of being disciplined however Secretary Fosler transferred*
> *Ms. Wolf to a different facility. Id. Ms. Wolf also received reprimands*
> *for repeating a racial slur one of the residents had directed at her,*
> *mislaying a ring of facility keys, and using her state-issued computer for*
> *personal business. 9ECF 49-17). These infractions are sufficiently*
> *similar to those Plaintiff allegedly committed to qualify Ms. Wolf as a*
> *comparator.*[85]

**The Amendment Allowing a 1981 Claim to be Pursued**.

As admitted by Defendant,  Tynes' complaint did mention §1981 in paragraph

3 of the complaint, an allegation which was admitted by Defendant, as well as the use

---

[84]    Ex. 5, D.E. 64; TT. 5 at 95, 99.

[85]    D.E. 61.

of the terminology in paragraphs 38 and 55 indicating that Plaintiff was a member of a protected class and the reference to §1981 in subparagraph (a) of the prayer for relief. Paragraph 37 of the complaint alleged that Ms. Tynes was a member of a protected class under §1981, an allegation admitted by Appellant. The complaint alleged that Ms. Tynes had been discriminate against because she was black.[86]

The references to §1981 in the complaint pre trial were not questioned by Appellant through any motion.

When the matter of a §1981 claim being included was brought up at trial by The Department's lawyer, defense counsel's initial posture was that the only difference between a §1981 and Title VII race claim was that of damages that a plaintiff may be entitled to,[87] but through a later memo sought to bring out that the burden of proof required a "but for" analysis, this colloquy followed:

*The Court Well, I mean, when Mr. Miller is asking for over a million dollars in damages, I mean, the only way he can ask for that is under 1981, right?*

*Mr. Williams: I would agree with that, Your Honor.*

*The Court: So how are you prejudiced by the fact that he didn't set out a completely separate 1981 count in his complaint and just referred to it a couple of time?*

---

[86]    D.E. 1.

[87]    TT. 6 at 44.

*Mr. Williams: Well, not only are we prejudiced by his failure to put in the complaint, Judge, but when we got together to prepare the pretrial stipulation for this trial, there is not request or mention in that pretrial stipulation to include a Section 1981 claim.*

*So we came to trial with the notion that this claim has been waived. And yet in opening statements, we hear him - - I'm sorry - - we hear the plaintiff discuss with this jury the notion that damages are uncapped under 1981. Also at that point we now know that he intends to proceed in front of this jury under 1981; a claim that, candidly has never been significantly pursued in the case.*

*And I would suggest that because the "but for" standard is a higher standard than the standard Title VII - - the standard for title VII being a factor in the decision-making process - - that the evidence that's been presented here doesn't come close to a "but for" standard. In fact, the plaintiff is proceeding not only on her race claim but on a gender claim.*

*The Court: Why can't he do that? Why can't he say that but for the racial discrimination, she wouldn't have been fired; but also a motivating factor was sex? Why can't you have your cake and eat it too?*

*Mr. Williams: Well, Judge, if the "but for" reason  - - meaning, the specific reason was that she was terminated was gender - -*

*The Court: I don't think that "but for" means it's the only reason. I think "but for" means that without that reason, she wouldn't have been terminated. But that doesn't mean that there couldn't have been other reasons that contributed to it but didn't affect the decision.*

- - - - - - --

*The Court: What would you have done differently had he put the 1981 in your pretrial stip? How are you prejudiced by him not clearly setting forth in the pretrial stipulation that he was also proceeding under §1981?*

*Mr. Williams: We could easily have put more emphasis in the defense of this case on the race issue. If we thought that what we were facing was the difference*

21

*between damages that were uncapped and damages that were capped, our focus would not have been as equally paired with respect to gender and race.*

*I mean, that becomes clearly - - it becomes much - - it looms much larger for my client if there are uncapped damages under one cause of action and not under another.*

*The Court: Well, I think since the opening statement it's been clear that the plaintiff was proceeding under 1981. I think that, you know, I've got the discretion to allow an amendment of the complaint even during the trial. I don't see that there is prejudice, so I'm going to deny the §1981 Rule 50 motion.*[88]

## **Summary of Argument**

A title VII case may be proven through the use of circumstantial evidence in which a plaintiff may resort to what is known as the McDonnell Douglas framework which requires a prima facie showing of discrimination, then shifting the burden to the defendant to articulate a legitimate non discriminatory reason for its actions but which then allows the plaintiff to present evidence that the defendant's claimed resort is but a pretext. The use of comparators that are similarly situated to the situation of the plaintiff is permissible can be resorted to, but the plaintiff is also allowed to make out convincing mosaic of discrimination.

Appellee, Ms. Tynes presented competent evidence which was legally sufficient was legally sufficient to establish a convincing mosaic of discrimination thereby making it appropriate for the jury to pass upon her claims. Alternatively, her

---

[88]    TT. 6 at 45-47.

use of comparators was appropriate under the dictates of *Lewis v. City of Union City*, 918 F. 3d 1213 (11th Cir. 2019) rendering her claim equally available for jury consideration.

Appellant was not able to show actual prejudice when the Court considered and granted Appellee's request to amend, or more apt correct, Appellee's complaint to include a 1981 claim. Hence, under the command of Rule 15 (b) an amendment to include the claim was in order. The assertion that the case suffered from the lack of a showing under the "but for" standard is shown to have no merit from the fact that the jury was provided a charge on the issue and they determined the evidence was present to enable them to respond on a special verdict form.

### **Argument**

## I.    **APPELLEE DID NOT FAIL TO PROVE HER TITLE VII CLAIMS FOR RACE AND SEX DISCRIMINATION**

### **A. Standard of Review.**

True, a ruling on a Rule 50 motion is reviewed *de novo*. However, we must keep in mind that:

> *Under Rule 50, the "proper analysis is squarely and narrowly focused on the sufficiency of evidence," that is, whether the evidence is "legally sufficient to find for the party on that issue." Chaney v. City of Orlando, 483 F.3d 1221, 1227 (11th Cir. 2007). All reasonable inferences are drawn in favor of the nonmoving party, no credibility determinations may be made, the evidence may not be weighed, and evidence that the*

23

*jury need not have believed is to be disregarded. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Such a motion is to be granted "only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001).*[89]

**B. What Is Required to Make Out a Prima Facie Case.**

Recently in *Jenkins v. Nell*, 26 F. 4th 1243 (11 Cir. 2022) this Court at p.1249 noted that the elements of a race discrimination under 42 U. S. C. §1981 are also the same as a Title VII disparate treatment claim in the employment context and that a plaintiff may use either direct evidence or circumstantial evidence to show race discrimination. If a plaintiff uses circumstantial evidence the *McDonnell Douglas* burden shifting framework comes into play. A plaintiff may establish discrimination through the introduction of circumstantial evidence that creates an inference of discrimination.[90] In this context, "circumstantial evidence" is that which permits an

---

[89]    *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 948 (11th Cir. 2018).

[90]    *Jenkins, supra*, at 1249*; see also  Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 920 (11th Cir. 2018); *Bass v. Bd. of County Comr's. Orange Co.*, Fla., 256 F. 3d 1095 (11th Cir. 2001); *Denney v. City of Albany*, 247 F. 3d 1172, 1182 (11th Cir. 2001);  *EEOC v. Joe's Stone Crab*, 220 F. 3d 1263, 1286 (11th Cir. 2000)*; Harris v. Shelby County Bd. Of Educ.*, 99 F. 3d 1078, 1083 (11th Cir. 1996).

inference of discrimination. An indirect racial comment can be used as circumstantial evidence.[91]

The *McDonnell Douglas* framework is that established by *McDonnell Douglas Corp. v. Green*, 411 U. S. 792, 93 S. Ct. 1817 (1973) wherein the Plaintiff must first make out a *prima facie* case of discrimination. To avoid liability, the defendant is required to come forth with evidence articulating a legitimate, non-discriminatory reason for the challenged employment actions.[92]  The articulated reasons "must be clear and reasonably specific".[93]  If the employer articulates a clear and specific

---

[91]        *See Jenkins v. Nell, supra* at 1251:

> *Next, Nell's racially-biased comments can be circumstantial evidence to support an "inference of discrimination" even if the comments were not made close to the termination decision and were too remote in time or too attenuated to constitute direct evidence of discrimination. See Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998). Nell vigorously attempts to discredit the testimony of two black former GPA employees about Nell's comments in referring to white crane operators, including Jenkins, as racists, and social meetings of white crane operators as "Klan meetings." Whether those comments allow an inference of discrimination turns on whether the jury believes Nell or two former employees. See Strickland, 692 F.3d at 1162.*

[92]        *Denney v. City of Albany*, 247 F. 3d 1172, 1183 (11th Cir. 2001); *Holifield v. Reno*, 115 F. 3d 1555, 1564 (11th Cir. 1997); abrogated in part by *Lewis v. City of Union County, Aa.*, 918 F. 3d 1213 (11th Cir. 2019) regarding comparators.

[93]        *Dep't of Community Affairs v. Burdine,* 450 U. S. 248, 258, 101 S. Ct. 1089, 1096 (1982).

legitimate basis for the actions, then the employee may provide evidence to permit a finding that the reasons proffered by the employer are a pretext.[94]  "A defendant's failure to follow its own policies, as well as selective application or enforcement of its policies, can be evidence of pretext."[95] An employee may demonstrate this by showing that the reasons articulated by the employer are "unworthy of credence" or by showing that the employer was more likely materially motivated by discriminatory reasons.[96] Evidence produced in support of the prima facie case is taken into account in determining the pretext.[97] *The ultimate responsibility to weigh the evidence and make appropriate credibility determinations is upon the fact finder.*[98]  The employee need not prove the employer relied only upon improper factors, but rather only

---

[94]     *Chapman v. A1 Transport*, 229 F. 3d 1012 at 1024 (11th Cir. 2000).

[95]     *R&R Ground Maint. Inc. v. Ala. Power Co.*, 713 F. App'x 853, 858 (11th Cir. 2017) (per curiam) (discussing § 1981); see *Luke v. Univ. Health Servs., Inc*., 842 F. App'x 503, 510 (11th Cir. 2021) (per curiam) ("*An employer's deviation from its policies can be evidence of pretext"* in the context of Title VII*); Ritchie v. Indus. Steel, Inc*., 426 F. App'x 867, 873 (11th Cir. 2011) (per curiam) (*"A plaintiff can also show pretext by demonstrating that the employer did not follow its normal procedures in terminating his employment*.").

[96]     *Reeves v. Sanderson Plumbing Products, Inc*., 530 U. S. 133, 143, 120 S. Ct. 2097, 2106 (2000).

[97]     *Id.* at 530 U. S. 143, S. Ct. 2106.

[98]     *Harris v. Shelby*, 99 F. 3d at 1084 (citing *Walls v. Button Gwinnett Bancorp., Inc*. ,1 F. 3d 1198, 1200 (11th Cir. 1993).

26

provide that his or her race or sex was a motivating factor in the employer's decision.[99]

Under *McDonnell Douglas* the plaintiff bears the burden of establishing a prima facie case of race discrimination by demonstrating that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified to perform the job in question; and (4) his employer treated "similarly situated" employees outside his class more favorably.[100]   To establish the fourth prong, the plaintiff must present evidence of a comparator—someone who is "similarly situated in all material respects."[101]   Although what constitutes a "material" similarity or difference will differ from case to case, ordinarily a similarly situated comparator and the plaintiff will have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an

---

[99]    *McDonnell Douglas* 411 U. S. At 800-02; *Coffman v. Chugach Support Services, Inc*., 411 F. 3d 1231, 1238 (11th Cir. 2005).

[100]    *Lewis v. City of Union,* 918 F.3d at 1220–21.

[101]    *Id.* at 1224.

27

employment or disciplinary history.[102] A valid analysis does not look at "formal labels, but rather [at] substantive likenesses."[103]

A comparator is not a must and the failure to produce a comparator does not doom a plaintiff's case if the plaintiff can present a convincing mosaic of circumstantial evidence from which a fact finder can infer discriminatory motivation.[104] A plaintiff may meet this standard by showing, "among other things, (1) 'suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."[105] Such evidence must lead to the "unavoidable inference" of intentional discrimination.[106]  While the "convincing mosaic" method bears similarities to the McDonnell Douglas method, it operates as a totality-of-circumstances test rather than a rigid step-by-step analysis.

---

[102]    *Jenkins v. Nell,* 26 F.4th 1243, 1249 (11th Cir. 2022).

[103]    *Menefee v. Sanders Lead Company*, 786 Fed. Appx 963, 967 (11th Cir. 2019).

[104]    *Lewis v. City of Union City,* 934 F. 3d 1169, 1185 (11th Cir. 2019).

[105]     *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011).

[106]    *Smith v. Lockheed-Martin Corp.*, 644 F.3d at 1346 (11th Cir. 2011).

We daresay that the evidence adduced at trial was sufficient and adequate under the strictures of Rule 50 to establish a convincing mosaic of circumstantial evidence from which the jury properly determined the presence of discriminatory motivation.[107]  Certainly the timing of the dismissal rather than allowing Ms. Tynes time to address the concerns, a feature given to others, the timing of Technical Assistance inquiry and delivery of the report, Dr. Negron's testimony exposing the venomous mind set of Dixie Fosler as pertained to Ms. Tynes, Ms. Fosler's lack of candor as indicated by her at times eliptical answers to questions, and the manner by which she treated others who had uttered racial comments, all rendering her supposed reliance on the report she relied on to discharge Ms. Tynes but a pretext and her request for it, the picking of the staff to undertake the report, her participation in its preparation, but a ploy to cover her dislike for Ms. Tynes.[108]  Dr. Negron's testimony laid bare and exposed Dixie Fosler's prejudices, a person that would not touch others that make racial comments and who would come to blows with others, but as one who was attempting to be crafty and the jurors saw right through her.  Certainly the totality of the circumstances exposed Fosler for her true self.[109]

---

[107]    *Lewis v. City of Union City,* 934 F. 3d 1169, 1185 (11th Cir. 2019).

[108]    *Smith*, 644 F.3d at 1346.

[109]    *See Mosley v. Preston Cycles West, LLC.*, 2021 WL4815901, 17 (N. D. Ga. 2021)("While the "convincing mosaic" method bears similarities to the

Regarding the comparables, the trial court's observation and determination of the propriety of allowing Seeber and Ms. Wolf as comparators was mindful and most allegiant to the requirements of *Lewis v. City of Union City*. The setting is not comparable to that of *Blash v. City of Hawkinsville*, 856 Fed, Appx. 259 (11th Cir. 2021) where the attempt was made to show a white person receiving better treatment than a black person where the white persons were accused of more serious offenses.

The trial court correctly focused, and at the expense of appearing repetitious and plagiarizing somewhat we use its wording, the issue for consideration for *Mr. Seeber and* [Ms. Tynes] *were both Superintendents, both had serious incidents reflecting a failure to abide by* [The Department's] *protocols during their tenures as Superintendents, and both had administrative deficiencies memorialized in operational reviews. They are therefore similarly situated in all material respects. Yet in response to Mr. Seeber's failures, he was simply transferred to different facilities, while* [Ms. Tynes] *was immediately subjected to review by a technical assistance team and terminated within a month.* Additionally, *Mr. Seeber was apparently granted several opportunities to comply with the recommendations of the quality improvements reviews, but* [Ms. Tynes] *was allegedly never even presented*

─────────────

McDonnell Douglas method, it operates as a totality-of-circumstances test rather than a rigid step-by-step analysis.").

with the technical assistance team's report.  It appears the report was not even finalized until after her termination...Although [The Department] relies on Secretary Fosler's affidavit for the fact that the incidents were not attributable to Mr. Seeber, this merely begs the question: why was the poor performance of Mr. Seeber's staff not attributable to his management, but the poor performance of [Ms. Tynes'] staff was not attributable to hers.

As pertains to Ms. Wolf, a white female,  who was superintendent of  Miami Detention Center when she failed to correct issues brought up in her annual quality assurance reviews...She was also shown to have physically "put her hands on" another employee. While the Department asserts that these incidents are entirely different from Ms. Tyne's misconduct, the Department neglects to address an incident for which Dr. Negron stated ... that she wanted to take disciplinary action against Ms. Wolf: an incident where Ms. Wolf provided youths with spray paint and permitted them to paint one of the hallways of the Miami facility, which led to several staff members having asthma attacks and the youths painting gang symbols on the walls. .... Instead of being disciplined however Secretary Fosler transferred Ms. Wolf to a different facility... Ms. Wolf also received reprimands for repeating a racial slur one of the residents had directed at her..... These infractions are sufficiently similar to those Ms. Tynes allegedly committed to qualify Ms. Wolf as a comparator.

31

## II. MS. TYNES DID PRESENT SUFFICIENT EVIDENCE FOR CONSIDERATION OF A CLAIM UNDER §1981 AND THE TRIAL COURT DID NOT COMMIT ERROR IN ALLOWING AN AMENDMENT TO ALLOW THE CLAIM.

In reviewing the trial court's decision to allow an amended claim under 1981 the foremost authority that should be considered is that part of Fed. R. Civ. P. 15(b) stating "The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. Courts routinely allow such amendments to cure pleading deficiencies in service of the general principle that "decisions on the merits are not to be avoided on the basis of 'mere technicalities'".[110] Amendments are appropriate where a party have actual notice of an unpleaded issue or that amplifies that which has been alleged, more so where the evidence on the amended issue is substantially the same as that on that which has been raised through the existing pleading.[111]    From inception the Department was advised by the complaint that Tynes was resorting to Title VII and 1981 in her action but never questioned it.  It is apparent that the Department had actual notice of the issue but

---

[110]    *Schiavone v. Fortune*, 477 U.S. 21, 27, 106 S. Ct. 2379, 2383 (1986) (quoting *Foman v. Davis*, 371 U.S. 178, 181 (1962).

[111]    See *Kim v. Nasa Finch*, 123 F. 3d 1046 (8th Cir. 1997)(involving claim originally brought Title VII and request to amend to include claim on § 1981with court acknowledging that the evidence relevant to the claims was the same).

opted for the strategy to try to eliminate the claim by storing argument of surprise or being mislead for trial, all the time having to admit that the elements for a Title VII and 1981 are the same. But when it came to trial and made its move it was unpersuasive to believe that it had been misled, duped or otherwise surprised. When asked about what actual prejudice it was to suffer no direct answer came forth, instead switching the argument then to an insufficiency of proof on the basis of the "but for" requirement posed by *Comcast Corp v. National Ass'n of African American Owned Media*, 589 US ____, 140 S. Ct. 1009 (2020) of which the lower tribunal had knowledge of sufficient to have a jury instruction prepared on the issue.

The transparency of the Department's suggestion of prejudice was made clear when the Court asked of defense counsel what would have been done differently had the 1981 claim been put in the pretrial stipulation and counsel, after a five day trial in which incisive and piercing questions were asked by counsel, retorted that "We could easily have put more emphasis in the defense of this case on the race issue" adding somehow that the difference between capped and uncapped damages differed in trial preparation - a proposition that is difficult to believe by even the veriest tyro as we all must prepare thoroughly if we are to go to law before a jury for experience tells us that this is comparable to taking a tiger by the tail.

33

The Department then maintains that the absence of mentioning "but for" in opening and closing precluded the jury from determining the "but for" inquiry that is required.  What the Department wishes to overlook is that the jury was given instructions on the matter and it was then within their province to determine the issue.

At page 42 of its brief the Department attempts to make it appear that the verdict was inconsistent stating "the jury found that Appellee's race was the "but for" cause of her termination. However it also simultaneously found that she was fired due to her race and sex."  The response on the verdict form what the "race or sex" was a motivating factor that prompted termination with the answer to question 3 being that race was the "but for" cause of termination. Any argument that this was somehow inconsistent was waived as an inconsistent verdict must be challenged before the jury is discharged.[112]

The Department also points to the jury's finding to state that despite the jury making the finding on the but for issue, somehow the matter was not proven.   This assertion is faulty and is neither analyzed or dissected and apparently is meant to be taken as absolute truth.  As previously stated the evidence should be viewed in the light most favorable to a jury's verdict, giving Ms. Tynes the benefit of all inferences

---

[112]    See *Sands v. Kawasaki Motors Corp, U. S.* A., 513 Fed. Appx. 847, 857 (11th Cir. 2013).

that may reasonably be drawn from that evidence and it was the Department's burden in this appeal to show precisely why the jury could not have reached its verdict in the manner in which it did.[113]

---

[113]      We believe the Department is somehow indicating that race must be sole reason for the discharge and our research suggests that this would overstate the holding of Comcast for as stated in *Bowie v. Automax Used Cars, LLC*, No. CIV-21-393-D, 2021 WL 5065852, at 2 (W.D. Okla. Nov. 1, 2021):

 *""but for" causation does not require that race be the sole reason for an adverse employment action. See Jones v. Okla. City Pub. Sch., 617 F.3d 1273, 1277 (10th Cir. 2010) ("but for" causation for age discrimination claim "does not require plaintiffs to show that age was the sole motivating factor in the employment decision"). As explained by the Supreme Court:*

*[But-for causation] is established whenever a particular outcome would not have happened 'but for' the purported cause. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.*

*This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.*

35

The Department's argument that Ms. Tynes did not meet the "but for" requirement rings hollow when one considers that the jury was charged on the duty to make this determination and so found in Ms. Tynes' favor.

## Conclusion

Based on the authorities cited and the arguments made above, we request that the Court affirm the judgments appealed from.

Dated: April 13, 2022.

> Glenn R. Miller (FL Bar 539376)
> GLENN RICARDO MILLER, LLC
> 67 N.E. 168th Street
> N. Miami Beach, FL 33162
> Tel: 305-651-5991
> Email: grmpalaw@gmail.com
> *and*
> ARNALDO VÉLEZ, P.A.
> 35 Almeria Avenue
> Coral Gables, Florida 33134
> Tel: 305-461-9499
> avelez@velezlawoffices.com
>
> By: _/s/ Arnaldo Vélez_
>       FL Bar 149589
>
> *Co-counsel for Plaintiff-Appellee*

**Certificate Of Compliance**

Pursuant to Fed. R. App. P. 32(g)(1), and 11th Cir. R. 32-4, I hereby certify that the foregoing Answer Brief of Plaintiff-Appellee complies with Fed. R. App. P. 32(a)(7)(B) in that it has been prepared using Word Perfect, 14-point Times New Roman font and contains 8,541 words, excluding the parts of the documents exempted by 11th Circuit Rule 32-4.

> Glenn R. Miller (FL Bar 539376)
> GLENN RICARDO MILLER, LLC
> 67 N.E. 168th Street
> N. Miami Beach, FL 33162
> Tel: 305-651-5991
> Email: grmpalaw@gmail.com
> *and*
> ARNALDO VÉLEZ, P.A.
> 35 Almeria Avenue
> Coral Gables, Florida 33134
> Tel: 305-461-9499
> avelez@velezlawoffices.com
>
> By:  /s/ Arnaldo Vélez
>        FL Bar 149589
>
> *Co-counsel for Plaintiff-Appellee*

**Certificate of Service**

I hereby certify that a true and correct copy of the above and foregoing Answer Brief of Appellee was electronically filed with the Clerk of the Court via CM/EFC and served on the parties listed in the Service List below in the manner indicated therein.

Glenn R. Miller (FL Bar 539376)
GLENN RICARDO MILLER, LLC
67 N.E. 168th Street
N. Miami Beach, FL  33162
Tel: 305-651-5991
Email: grmpalaw@gmail.com
*and*
ARNALDO VÉLEZ, P.A.
35 Almeria Avenue
Coral Gables, Florida 33134
Tel: 305-461-9499
avelez@velezlawoffices.com

By:  /s/ Arnaldo Vélez
    FL Bar 149589

*Co-counsel for Plaintiff-Appellee*

38

**Service List**

David J. Smith, Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St. N.W.
Atlanta, GA 30303
*Via CM/ECF and Federal Express*

Carri S. Leininger
Jayme Sellards
Williams, Leininger & Cosby, PA
11300 US Highway One, Suite 300
N. Palm Beach, FL 33408
*Counsel for Appellant*
*Via CM/ECF*

P:\G V\APPEALS\TYNES\Answer Brief of Appellee.Final.wpd